# United States Court of Appeals
## For the First Circuit

Nos. 24-1770,24-1771,24-1772,24-1773,24-1774

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff, Appellee,

v.

ZHIYING YVONNE GASARCH; MIKE K. VELDHUIS; PAUL SEXTON;
COURTNEY KELLN; JACKSON T. FRIESEN,

Defendants, Appellants,

FREDERICK L. SHARP; WILLIAM T. KAITZ; AVTAR S. DHILLON;
GRAHAM R. TAYLOR,

Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Gelpí, Thompson, and Montecalvo,
Circuit Judges.

Karen A. Pickett, with whom Pickett Law Offices, P.C. was on
brief, for appellant Zhiying Yvonne Gasarch.

Katie Renzler, with whom Michael Tremonte and Sher Tremonte
LLP were on brief, for appellant Mike K. Veldhuis.

Robert S. Silverblatt, with whom Stephen G. Topetzes, Neil T.
Smith, and K&L Gates LLP were on brief, for appellant Paul Sexton.

Frank Scaduto, with whom Kevin B. Muhlendorf and Wiley Rein LLP were on brief, for appellant Courtney Kelln.

Maranda Fritz, with whom Timothy J. Fazio and MG+M The Law Firm were on brief, for appellant Jackson T. Friesen.

Kerry J. Dingle, Senior Appellate Counsel, with whom Jeffrey B. Finnell, Acting General Counsel, Tracey A. Hardin, Solicitor, and Daniel Staroselsky, Assistant General Counsel, were on brief, for appellee.

February 19, 2026

**THOMPSON**, <u>Circuit Judge</u>.  The prospect of buying low on a stock just before it shoots the moon has enamored investors for centuries.  But, as commonsense suggests and history has proven, not every start-up becomes a blue chip and not every investment reaps retirement-worthy profits.  So, rather than taking a risk in search of the next big bonanza, some underhanded financiers elect to rig the system in their favor and, to the unfortunate detriment of unsuspecting investors, profit off pure speculation that they deceitfully conjure up.

Appellants Zhiying Yvonne Gasarch, Jackson Friesen, Mike Veldhuis, Paul Sexton, and Courtney Kelln participated in a scheme to do just that before they ran headfirst into federal securities laws.  For nearly a decade, appellants -- led by a character named Frederick ("Fred") Sharp -- bought up cheap stocks in bulk, paid promoters to drum up misleading hype for their stocks, and then sold off their shares at artificially inflated prices.  All the while, appellants went to great lengths to hide their ownership of these stocks and their involvement in this nefarious scheme.

When the music stopped and the lights came on, all five appellants found themselves subject to an SEC civil enforcement action and liable to pay back millions in ill-gotten gains.  Appellants Gasarch and Friesen now appeal the results of their respective jury trials, and the remaining appellants appeal the remedies imposed by the district court after they waived their

trial rights and conceded liability. For myriad reasons, each appellant claims error occurred below and that the district court abused its discretion in ordering the remedies it deemed fitting of the offenses. It will take us a minute to explain all of this, so hunker down and read on to learn why we mostly agree and affirm across the board, but for one remedy pertaining to appellant Sexton.

## I. SCENE-SETTING

### A. Statutory Background

Before explaining the sophisticated scheme devised by appellants, we lay some foundation on the federal securities laws and regulations at issue in this appeal. While we will attempt to do as much table setting as we can here, we will be supplementing our legal discussion throughout the course of this multi-faceted opinion.

This appeal follows an SEC civil enforcement action that targeted a specific species of securities violations related to stock registration and sale requirements. Securities (a broad category of financial instruments which stocks are a part of) must be registered before offering them for public sale pursuant to Section 5 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e, unless they (1) fall under certain exemptions, or (2) the security is a stock sold in accordance with the terms of SEC Rule 144, 17 C.F.R. § 240.144A. This registration requirement

is the "linchpin" of the Securities Act and "protects investors by ensuring that companies issuing securities (known as 'issuers') make a 'full and fair disclosure of information' relevant to a public offering." Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 178 (2015) (quoting Pinter v. Dahl, 486 U.S. 622, 646 (1988)).

A few pages over in the U.S. Code lives Section 13(d) of the Securities Exchange Act of 1934 ("Exchange Act"). Of import here, that provision requires beneficial owners of more than five percent of certain classes of securities to disclose to the SEC their ownership interest in that security and other relevant information. 15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-1(a). A beneficial owner includes any person who has voting power to direct voting of a security or investment power to direct the disposition of a security. 17 C.F.R. § 240.13d-3(a). In essence, this disclosure requirement seeks to keep tabs on who owns a large chunk of a registered stock, how many shares they own, where they got the money to purchase the stock, and why they made the purchase. See Tax-Free Fixed Income Fund for P.R. Residents, Inc. v. Ocean Cap. LLC, 137 F.4th 6, 18-19 (1st Cir. 2025) (citing Gen. Aircraft Corp. v. Lampert, 556 F.2d 90, 94 (1st Cir. 1977)).

We need to introduce one more genre of securities law pertaining to fraudulent conduct that artificially inflates demand for a certain security. First, under Section 10(b) of the Exchange

Act, 15 U.S.C. § 78j(b), it is unlawful to use or employ "any manipulative or deceptive device or contrivance" to circumvent the rules and regulations the SEC promulgates to protect investors and the public interest.  Similarly, under Section 17(a)(1) and (a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(1), (3), it is "unlawful for any person in the offer or sale of any securities" to "employ any device, scheme, or artifice to defraud," or "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  And if those terms sound expansive, that was the legislative idea.  United States v. Naftalin, 441 U.S. 768, 773 (1979) (explaining that "Congress expressly intended to define" fraud "in" the "offer" and "sale" broadly).

The relevancy of these three areas of securities law will become clearer as we explicate appellants' path to our court. But, for now, what we've laid out should give the reader a sufficient understanding of conduct prohibited by our Nation's securities laws to appreciate appellants' contravening scheme.

## B. Factual Background

Because this case comes to us following a jury trial and the entry of consent judgments, we recount the relevant facts in the light most favorable to the verdicts, SEC v. Happ, 392 F.3d 12, 17 (1st Cir. 2004), or otherwise as found by the district

court, consistent with record support, BioPoint, Inc. v. Dickhaut, 110 F.4th 337, 341 (1st Cir. 2024).

### 1. The Scheme

Between 2010 and 2019, appellants participated in an elaborate securities fraud scheme involving a series of separate (but functionally parallel) endeavors, colloquially referred to as pump and dump schemes. SEC v. Sharp (Sharp I), 626 F. Supp. 3d 345, 366 (D. Mass. 2022); see also SEC v. Sharp (Sharp II), 737 F. Supp. 3d 66, 73 (D. Mass. 2024) (citing Sharp I for factual background). Each pump and dump here (fourteen at issue in this enforcement action) proceeded in three steps, with each appellant playing a different role (which we will dissect in detail shortly). First, certain appellants accumulated blocks of penny stocks in national micro-cap companies.[1] Second, the group aggressively promoted these companies' stocks using paid promotions to garnish

---

[1] To minimize any head spinning, we will provide definitions for any finance jargon introduced along the way. Here, a penny stock is a general term given to shares of a small company that trades at a low price, usually under $5 a share. Penny stocks are notoriously volatile and risky and are often traded directly "over the counter" as opposed to on large stock exchanges like the New York Stock Exchange or the NASDAQ. A micro-cap company is a company with a market capitalization between $50 million and $300 million. Micro-cap companies can be lucrative investments, with lots of room for growth, but also risky. For reference, the market capitalization of the behemoth Coca-Cola Corporation is over $300 billion. Yahoo! Finance, The Coca-Cola Company (KO), https://finance.yahoo.com/quote/KO/ (last visited Jan. 21, 2026), [https://perma.cc/E67X-K5ZF]. So appellants dealt in small peanuts by comparison.

attention and the interest of unwitting investors.  And third, after hyping the stocks (deceptively pumping up their value), the group sold them to unsuspecting investors (dumped them) using shell or nominee companies and offshore brokerage accounts that they specifically set up to skirt federal securities laws.  Sharp II, 737 F. Supp. 3d at 73.  Over the years, appellants repeated this process to the tune of more than $1 billion in gross proceeds.  Sharp I, 626 F. Supp. 3d at 366.

## 2. The Players

The just-described scheme began with the ideations of an individual named Fred Sharp (code name "BOND").[2]  Sharp is not a party in this appeal,[3] but his spectre looms over many of the legal issues we must address.  Sharp was a financial professional and the criminal mastermind directing a firm known as the Sharp Group.  Sharp I, 626 F. Supp. 3d at 366.  In exchange for a lucrative fee, the Sharp Group offered a white glove securities fraud service for wealthy individuals seeking to score big returns.  The enterprise

---

[2] The reader will soon learn that Sharp (primarily running this scheme from Canada) worked hard to conceal his operation and transactions.  Part of that process included encrypted communications and the use of code names (and sometimes more than one code name per person).  Sharp dubbed himself "BOND" after novelist Ian Fleming's fictional British Secret Service agent with a propensity for high-speed chases, fine suits, and shaken -- not stirred -- martinis.

[3] Following Sharp's failure to appear and the SEC's motion for default, the district court entered a default judgment against Sharp.  Sharp I, 626 F. Supp. 3d at 364.

provided a bundle of services to its clients such as setting up shell companies to conceal their stock ownership, creating nominal beneficial shareholders,[4] offering offshore accounts, facilitating deceptive stock transfers and money transfers, offering encrypted accounts and communication systems, and producing fabricated documents (such as fugazi loan agreements) to aid in the pumping and dumping of their stocks. Sharp I, 626 F. Supp. 3d at 366. Sharp's services provided his clients with valuable anonymity and distance from SEC regulators, all with the goal of keeping them out of jail.[5] But, importantly, he didn't work alone.

Enter stage left appellants Gasarch and Kelln. Gasarch (code name "WIRES") was one of Sharp's employees and was described as "the master of finance." Gasarch handled the Sharp Group's wire transfers, making sure proceeds from fraudulent stock sales went to the right client and ensuring clients could access their funds when needed. Sharp II, 737 F. Supp. 3d at 73 (citing Sharp I, 626 F. Supp. 3d at 366-67). To do so, Gasarch helped maintain records in the Sharp Group's internal accounting system and

---

[4] A nominal beneficial shareholder is a person or entity holding shares or assets on behalf of someone else, the latter of which typically remains anonymous -- a perk that prospective fraudsters would likely find appealing.

[5] Sharp also published a book titled Footloose; Charlie Smith's Offshore Chronicles that tells of a fictional character's masterful stock manipulations while working anonymously and far away from securities regulators.

routinely created false invoices to give the appearance of legitimate transactions. Id. (citing Sharp I, 626 F. Supp. 3d at 366-67).

While Gasarch moved the money, Kelln (code name "CELT"), another Sharp Group employee, played the ownership shell game. Kelln collected, allocated, and distributed shares of penny stocks under the Sharp Group's common control to nominee entities to keep the ownership of record under five percent (the threshold that triggers additional SEC disclosure and registration requirements). Id. at 73.

Lastly, we introduce the reader to appellants Veldhuis, Sexton, and Friesen (code names "ACCO" or "4", "HEAR" or "3", and "GARD" or "2" respectively) -- Sharp Group clients who operated together as a group for the purposes of acquiring, holding, and dumping shares of at least fourteen different stocks using the Sharp Group's services.[6] Sharp I, 626 F. Supp. 3d at 367. Each

---

[6] This trio acquired their shares in various ways including reverse mergers. See Sharp I, 626 F. Supp. 3d at 368 (describing the acquisition of shares in Stevia First/Vitality Biopharma Inc. through a reverse merger). A reverse merger is when a private company acquires a public company and its assets, and former shareholders of the private company swap their shares for shares of the newly-merged public company. So, it is effectively a way for a company to go public without having to make the disclosures about their business and ownership that typically accompany the transition to becoming a publicly-traded company. See United States v. Weed, 873 F.3d 68, 70 n.2 (1st Cir. 2017).

time the trio dumped their jacked-up stocks into the market, they reaped considerable profits.

## C. Procedural Background

The SEC finally caught onto this scheme and brought an enforcement action on August 5, 2021, against nine defendants including Sharp and our current gallimaufry of appellants.[7]  In its detailed complaint, the SEC alleged that Sharp, Kelln, Veldhuis, Sexton, and Friesen had violated Sections 17(a)(1) and (3), and Sections 5(a) and 5(c) of the Securities Act, Section 10(b) of the Exchange Act, and that Sharp and Kelln had aided and abetted the primary violations of Veldhuis, Sexton, and Friesen. The complaint also alleged that Gasarch had violated Section 17(a)(3) of the Securities Act and aided and abetted her compatriots in accomplishing their own primary violations.  (These violations fall under the registration, ownership disclosure, and anti-fraud securities laws set forth earlier.)

On the same day the complaint was filed, the SEC filed an emergency ex parte motion for a temporary restraining order freezing assets of the named defendants and requesting equitable relief from them all.  Sharp I, 626 F. Supp. 3d at 363.  The district court granted the TRO, along with a series of preliminary

---

[7] The other three original defendants have left the picture and, unlike Sharp, their involvement is tangential to the present appeal.  Therefore, we need not prolong this already lengthy matter with their backstory.

injunctions over the course of the following month to keep those assets frozen.  Id.

After fully entertaining a barrage of motions to dismiss filed by each of our current appellants, id. at 364, the district court denied them in full.  Id. at 403.  At this point, appellants Veldhuis, Sexton, and Kelln abandoned ship and conceded liability, agreeing not to "contest liability under the claims filed by the SEC" at the remedies stage.  Sharp II, 737 F. Supp. 3d at 72. Appellants Gasarch and Friesen, on the other hand, proceeded to trial.  So, let's talk about that and we'll loop Veldhuis, Sexton, and Kelln back into the discussion when we get to remedies.

## II. ACT ONE

A ten-day jury trial culminated in a series of unanimous jury verdicts finding both Gasarch and Friesen liable for all securities violations charged.  Both appellants say the district court whiffed on multiple fronts, beginning with the court's decision to admit a critical piece of evidence we alluded to earlier: the Sharp Group's internal accounting system known as the Q system.[8]  Next, Gasarch alone claims the district court erred in instructing the jury when it came to the charges against her. Finally, Gasarch mounts a challenge to the sufficiency of the

---

[8] Sharp got this name from the fictional James Bond character "Q" who led the research and development division of the British Secret Service and equipped 007 with gadgets and top-secret tech.

evidence used to hold her liable for violating multiple securities laws.

With the trial-related claims mapped out, we embark on our review of these appellate contentions -- starting with the admission of the Q system evidence.

### A. Admission of the Q System Evidence

Anonymity was one of the Sharp Group's primary goals, but at the end of the day, Fred Sharp had a business to run efficiently and a service to provide his clients. He couldn't afford to take his eye off the ball while he orchestrated the ownership shell game with his clients' investments. So, he asked his IT specialist (a character we will introduce soon) to create an encrypted internal ledger, and he dubbed it the Q system. The Q system kept track of all Sharp Group clients' stock holdings, the nominee companies being utilized, the purchases and sales of Sharp Group clients' stocks through those nominee companies, and all transactions for the business -- including payments to clients from their trade proceeds and commissions charged by the Sharp Group.

Gasarch and Friesen argue that evidence pulled from the Q system was admitted without proper foundation or authentication, or was otherwise inadmissible hearsay.[9] We review these

_____

[9] To be sure, appellants Veldhuis, Sexton, and Kelln also think the Q system evidence is problematic because it served as

- 13 -

evidentiary challenges for abuse of discretion, <u>United States</u> v.

<u>Paulino</u>, 13 F.3d 20, 23 (1st Cir. 1994), and "may affirm the

district court ruling on any ground apparent from the appellate

record," <u>United States</u> v. <u>Alzanki</u>, 54 F.3d 994, 1008 (1st Cir.

1995).  But before getting into the details of each argument, we

mark an important distinction.  The authentication of the Q system

evidence is a separate and distinct inquiry from the question of

admissibility.  <u>Paulino</u>, 13 F.3d at 24.  In other words, "[t]he

mere fact that a document is authentic does not necessarily mean

that it is admissible in evidence."  <u>Id.</u>  Since an inauthentic

document has no basis for being treated as evidence, we treat that

question as the logical starting point for our analysis.

**1. Authentication**

When we say evidence must be authenticated, we mean "the

proponent must produce evidence sufficient to support a finding

that the item is what its proponent claims it is."  <u>United States</u>

v. <u>Blanchard</u>, 867 F.3d 1, 5 (1st Cir. 2017) (quoting Fed. R. Evid.

901(a)).  Evidence of authenticity may come from "direct testimony

of either a custodian or percipient witness," or from elements of

the item itself, such as "[t]he appearance, contents, substance,

internal patterns, or other distinctive characteristics of the

---

the basis for the district court's disgorgement calculations.  In
our consideration of the Q system's admissibility, as raised by
Gasarch and Friesen, we are likewise responding to the other
appellants' similar arguments.

- 14 -

item, taken together with all the circumstances." Id. (first quoting Paulino, 13 F.3d at 23, and then quoting Fed. R. Evid. 901(b)(4)).

So, here, appellants claim that the SEC did not provide enough evidentiary information for the court to find that the Q system was indeed the Sharp Group's internal ledger that recorded the alleged fraudulent dealings and subsequent distributions. Specifically, Gasarch and Friesen take aim at the fact that the SEC may have presented a witness who created the Q system but did not present one who personally entered information into the Q system. Additionally, appellants argue that the SEC failed to provide evidence of the method, timing, basis for, or reliability of the entries within the Q system. By contrast, the SEC says it produced multiple witnesses whose testimony laid a proper foundation for finding that the Q system was exactly what the SEC said it was. Draw near as we walk through the testimony of those witnesses to decide whether the district court discretionarily erred in deeming the Q system authentic.

The SEC first names Fedir Nikolayev, the Q system's creator, as an authenticating witness.[10] Nikolayev, a Ukrainian software engineer residing in the Dominican Republic, worked as

---

[10] Nikolayev did not appear at trial, but his deposition -- which took place earlier in the Dominican Republic -- was recorded and played for the jury.

- 15 -

Fred Sharp's IT guru. In his testimony, Nikolayev explained how Sharp complained to him that Sharp's people struggled using Microsoft Excel, so Nikolayev suggested that he create a unique, web-based accounting system that Sharp could use to keep track of all his transactions. Nikolayev was one of two people (Sharp being the other) who had full access to the Q system. Nikolayev used his Q system credentials to monitor the system and make alterations at Sharp's request -- typically adding other users (like employees and customers) to the system and giving them limited access. Nikolayev testified that the Q system was designed, and used, to record all of the Sharp Group's transactions and monetary proceeds. He also mentioned that Sharp kept the Q system servers in Curaçao, a factoid that segways us to the SEC's next foundational witness.

At trial, the SEC called FBI Supervisory Special Agent Chris Gianakura to testify about the seizure of those Q system servers in Curaçao. Agent Gianakura had boots on the ground in Curaçao when he and "Dutch Police" raided a data center and seized servers hosting the Q system, including hard drives that had stickers on them labeled "Bond."[11] Agent Gianakura also described the legal process to get those Q system servers sent to the United States, which Sharp and his attorneys tried to prevent.

_____

[11] At trial, the parties stipulated to the fact that the SEC's exhibits containing Q data came from data stored on servers marked "Bond" obtained in Curaçao.

The third and fourth witnesses called in the authentication chain were two former users of the Q system. Roger Knox, a player deeply involved in Sharp's scheme,[12] testified that he knew Sharp used the Q system to keep track of cash and securities transactions. Knox also explained that he interacted with the Q system personally from 2011 to 2018, including his practice of entering information from a stock trade into the Q system less than 24 hours after making the trade. Additionally, Knox conducted his own monthly double-checks of the system, comparing his trade and proceeds records with the Q system to make sure everything added up. The other former Q-system-user-turned-SEC-witness, Kenneth Ciapala,[13] also testified to interacting with the Q system and recording his transactions therein at Sharp's request. Ciapala attested that Sharp told him to enter all trading and wiring information into the Q system, or else Sharp wouldn't do business with him.

With the SEC's foundational evidence laid out, we find it fatal to Gasarch and Friesen's assertion that only Nikolayev's testimony was available for the court's authentication considerations. As we've just outlined, the SEC called three more

---

[12] Knox pleaded guilty in a separate (but related) criminal action and has been ordered to pay restitution of $58,046,278.24 to over 8,000 defrauded investors.

[13] Ciapala also pleaded guilty to similar securities laws violations.

percipient witnesses with personal knowledge of the Q system -- specifically knowledge of how the SEC seized the system and how members of the scheme used and verified the data therein. Furthermore, we add that the content of disputed evidence "may itself furnish indicia of authenticity." See Paulino, 13 F.3d at 24. Entries in the Q system deploy code names tied to members of the scheme and list transactions of stocks during the time frame that the Sharp Group ran its pump and dump schemes. Cf. id. (finding a rent receipt authentic, in part, because it bore appellant's name, listed his apartment number, and referred to a time frame matching the offense). All Q data came from servers labeled "Bond" seized in Curaçao and Knox testified that when he entered trades into the Q system, he also assigned beneficiaries to those transactions using code names like "ACCO" (Veldhuis) and "GARD" (Friesen). Cf. United States v. Ceballos, 789 F.3d 607, 618 (5th Cir. 2015) (joining other circuits and finding "evidence of ledgers maintained in furtherance of conspiracies to be adequately authenticated by their distinctive contents and the circumstances of their discovery -- at least when the proponent offers the testimony of a participant in the conspiracy or a witness familiar with its operations").

Putting everything together and giving the requisite deference to the district court's considerable discretionary latitude, we cannot conclude the court abused its discretion in

finding that the Q system was what the SEC purported it to be. That is, the evidence produced by the SEC was sufficient to find that the Q system was the internal ledger that the Sharp Group used to keep track of its dealings and distribute the proverbial pie between members of the scheme. See Blanchard, 867 F.3d at 8 (finding sufficient foundational testimony while leaving further questions of fact for the jury).

## 2. Admissibility

As we noted earlier, authenticity and admissibility, while close cousins in the evidentiary family, are nevertheless separate inquiries. We now turn to whether the Q system, though authentic, was inadmissible hearsay as Gasarch and Friesen urge.

Briefly, and undisputed by the parties, because the Q system evidence contained out of court "statements" introduced by the SEC for the truth of the matter asserted, they are quintessential hearsay statements. See U.S. Bank Tr., N.A. as Tr. for LSF9 Master Participation Tr. v. Jones, 925 F.3d 534, 537 (1st Cir. 2019) (citing Fed. R. Evid. 801(c), 802). Accordingly, to be admissible, the evidence must fall under one of the exceptions to the bar against hearsay evidence. At trial, the district court posited that the Q system fell under an exception to hearsay known as the business records exception, see Fed. R. Evid. 803(6), and

- 19 -

later admitted the Q system into evidence on this ground, see Sharp II, 737 F. Supp. 3d at 90.[14]

The business records exception provides that "a record of an act, event, condition, opinion, or diagnosis is not excluded by the rule against hearsay" if certain criteria are met. Jones, 925 F.3d at 537 (citation modified). Those criteria are: (1) "the record was made at or near the time by -- or from information transmitted by -- someone with knowledge;" (2) "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling . . . ;" (3) "making the record was a regular practice of that activity;" (4) "all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification . . . ;" and (5) "the opponent does not show that the source of information or the method or circumstance of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6); United States v. Doe, 23 F.4th 146, 149 (1st Cir. 2022) (listing criteria).

Gasarch and Friesen challenge the applicability of the business records exception to the Q system evidence and attack the district court's decision from a few different angles. Gasarch

---

[14] The court confirmed this determination when addressing the parties' remedies arguments, Sharp II, 737 F. Supp. 3d at 90, because defense counsel pointed out that it wasn't clear whether the court had applied the business records exception or an exception for co-conspirator statements.

- 20 -

argues that Nikolayev's testimony did not satisfy the first three business-records-exception criteria and, alternatively, that the evidence "indicate[s] an utter lack of trustworthiness." Friesen sees the problem slightly differently. He argues that the declaration of SEC expert witness Ryan Murphy did not establish the reliability of the Q system evidence for entries regarding the allocation of stock holdings and profits to individuals. In forming this argument, Friesen concedes that the SEC verified (via Murphy's declaration) Q system evidence related to the sales of stocks by Sharp and his entities, but urges that does not necessarily prove the reliability of the rest of the Q system entries recording how Sharp dished out profits from those sales.

As we walk through both appellants' qualms and the district court's reasoning, "[t]he key question is whether the records in question are 'reliable enough to be admissible.'" Jones, 925 F.3d at 538 (quoting FTC v. Direct Mktg. Concepts, Inc., 624 F.3d 1, 16 n.15 (1st Cir. 2010)). And, based on the evidence presented by the SEC at trial, we cannot conclude that the district court abused its discretion in admitting the Q system evidence under the business records exception. Here's why.

The district court offered a few justifications when it finalized this evidentiary ruling. It noted that Nikolayev's testimony established that limited persons could make entries into the Q system and that the SEC's comparison of data from the Q

system with independent brokerage records "confirmed the reliability of Q data with considerable accuracy." Sharp II, 737 F. Supp. 3d at 90. More to this point, the court rattled off the near perfect comparisons between the Q system's transactional data and the records of independent brokerages for each of the fourteen stocks at issue. Id. Additionally, the court found the Q system data "highly accurate" because evidence at trial had "demonstrated that Q system entries were made very close in time to the illegal trading that occurred." Id. at 91.

Gasarch's assault on Nikolayev's qualifications to testify likewise do not persuade us that the district court abused its discretion. Contrary to Gasarch's apparent position, a "qualified witness" under Rule 803(6) "need not be the person who actually prepared the record." Jones, 925 F.3d at 538 (quoting Wallace Motor Sales, Inc. v. Am. Motor Sales Corp., 780 F.2d 1049, 1061 (1st Cir. 1985)). "Rather, a qualified witness is simply one who can explain and be cross-examined concerning the manner in which the records are made and kept." Id. (citation modified). Here, Nikolayev served that exact purpose. His testimony explained: (1) Sharp's reasoning for wanting the Q system created; (2) the different levels of access Sharp Group personnel had to the system; (3) how the Sharp Group used the Q system; and (4) that Sharp used the Q system as a regular function of his business. And throughout Nikolayev's deposition, defense counsel was present

- 22 -

and afforded an opportunity for cross-examination. Therefore, Nikolayev was "qualified" to testify within the meaning of Rule 803(6).

Friesen's separate challenge to the reliability of the Q system evidence tied to the allocation of proceeds requires a different approach.[15] To rehash this claim, Friesen bifurcates the data within the Q system into two camps: essentially transactional data and allocation data. Transactional data shows purchases and sales of stock, including how many shares and at what price. Allocation data shows where the proceeds went post-sale and to whom. Friesen argues that the SEC only demonstrated the Q system's reliability as to the transactional data, and did not meet such a burden as to the Q system's allocation data.

To resolve Friesen's challenge, we first look to the testimony of the two former Q system users we discussed earlier. Starting with Knox, he explained at trial that he would log onto the Q system server, enter in the data from a trade (such as the company and the quantity sold), and "the system worked out the commission that Fred Sharp was going to charge." Knox also testified that any trade documented in the Q system had a

---

[15] We lump in Gasarch's general challenge to the trustworthiness of the Q system evidence here because she has not specified any specific reason to question the trustworthiness of the evidence. Additionally, here we are intending to consider, and reject, appellants Veldhuis, Sexton, and Kelln's claim that the Q data is untrustworthy.

"beneficiary" with a corresponding code name for the account that the trade would be booked to. And, as we mentioned before, Knox said that he cross-verified his accounting ledgers with the Q system monthly to "make sure everything was accurate." As for the other former Q system user, Ciapala, we reiterate that Ciapala testified that not using the Q system was a barrier to doing business with Sharp.

Next, the SEC's expert witness Ryan Murphy testified to his analysis of all the Q records. Murphy first explained how he reviewed the transactional data and confirmed the sales of stocks by Sharp Group nominee companies (again, not the evidence Friesen claims was inadmissible hearsay). From there, Murphy bridged the gap from transactional data to allocation data and explained the process of internal transfers from a sale of stock to appellants' individual Q accounts. These internal transfers involved a debit from the transactional data and then a matching credit to the allocation data, with each transfer receiving a unique batch identification number and Sharp taking a commission.

In addition to this testimony, record evidence establishes the allocation data's reliability due to the financial interests of various parties in getting paid correctly. Sharp's scheme ran for nearly a decade, and his clients (including Friesen) stuck around because they were making money. Recovered text messages involving Friesen revealed that he made $173,000 in one

day (to which his partner recommended he go buy a boat) and $500,000 on another occasion. Furthermore, the SEC's evidence demonstrated contemporaneous requests from appellants (including Friesen) to access their allocated funds that matched debits in the same amount recorded in the Q system. For example, an exhibit entered at trial showed Friesen ("GARD") messaging Gasarch ("WIRES") on February 24, 2014, requesting a large sum of cash. The Q system allocation data for the "GARD" account shows a debit under the code "CASH" for $10,500 on February 24, 2014. Similarly, the Q system allocations measured Sharp's cut of the action -- meaning that everyone in on the scheme had reason to maintain the accuracy of the Q system. Cf. Jones, 925 F.3d at 538-39 (inferring the reliability of integrated business records based, in part, on the financial interests at stake).[16]

Based on the totality of evidence presented to support the reliability of all Q system records, the district court did

---

[16] Were we to add suspenders on top of this evidentiary belt, the Q system allocation data could have cleared the hearsay bar as statements of co-conspirators. See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. W. Lake Acad., 548 F.3d 8, 21 (1st Cir. 2008) (stating that a court may decline to reverse a decision to admit evidence under the business record exception when an alternate hearsay exception applies). Witness testimony established, and the parties concede, that Sharp or Knox entered the allocation data into the Q system following a trade. Such entries were made in the Q system under cover of code names for the purposes of continuing to conceal ownership and evade securities laws.

not abuse its discretion in admitting this evidence under the business records exception.[17]  So we soldier on.

## B. Jury Instructions

Gasarch alone challenges the jury instructions given at her trial regarding aiding and abetting liability.  She reprises here (as she did below) that jury instructions for aiding and abetting liability under 15 U.S.C. § 78t(e) must direct the jury to determine whether she had knowledge of the specific primary violations that she aided -- here being Sharp and his client's concealment of their stock ownership and their pump and dump schemes.  So, according to Gasarch, the district court went astray by (1) lowering the scienter standard from knowledge to knowledge or recklessness, and (2) informing the jury that the SEC "[has] to prove that Ms. Gasarch understood that her role or conduct was part of an overall activity that was improper" as opposed to proving knowledge of the specific violations.  The SEC submits that Gasarch's preferred instruction is inapplicable because it comes from out-of-circuit precedent that pre-dates important changes to the relevant securities statute and because it contains

_____

[17] Due to our resolution, we need not address Friesen's argument that the admission of the Q system evidence was not harmless.  And, for what it's worth, we agree with the SEC that Friesen's argument attempts to challenge the sufficiency of the evidence used to prove liability without having preserved this challenge below.  Friesen did not address this waiver problem in his reply brief, and regardless, the point is moot.

an inaccurate specific knowledge requirement contrary to our caselaw.

We review preserved challenges to jury instructions de novo, reversing a district court's refusal to give a certain instruction only where the requested instruction was "(1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point of the case." Davignon v. Hodgson, 524 F.3d 91, 108 (1st Cir. 2008) (quoting White v. N.H. Dep't of Corr., 221 F.3d 254, 263 (1st Cir. 2000)). If an error occurred, we then must determine whether that error was harmless. Id.

Upon our de novo review, Gasarch's challenge to the district court's jury instructions falls short for two reasons: her preferred instruction is incorrect as a matter of substantive law and her concerns were adequately incorporated into the instructions as given. Gasarch first seems to suggest that aiding and abetting liability under the Exchange Act and the Securities Act can only be established by proving knowledge of the primary violation. See SEC v. Apuzzo, 689 F.3d 204, 206 (2d Cir. 2012) (listing "'knowledge' of [the primary] violation" as the second element of the offense (quoting, in part, SEC v. DiBella, 587 F.3d 553, 566 (2d Cir. 2009))). However, as the SEC points out, the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act amended the relevant provision for aiding and abetting liability

- 27 -

to state that "any person that <u>knowingly or recklessly</u> provides substantial assistance to another person in violation of a provision of this chapter . . . shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." 15 U.S.C. § 78t(e) (emphasis added); <u>see also Apuzzo</u>, 689 F.3d at 211 n.6 (acknowledging the addition of "recklessly" to the relevant statute in 2010 but not applying the amended language). Accordingly, as a preliminary matter, Gasarch is incorrect in claiming that the district court's jury instructions needed to include a knowledge standard as opposed to a knowingly and recklessly one.

Additionally, after reading the jury instructions in full, we are persuaded that the instructions as given sufficiently incorporated Gasarch's concerns. Gasarch argues the court needed to instruct the jury that the SEC had the burden of proving she knew about the specific violations she aided and abetted. We read the court's instructions as incorporating this sentiment. The full instructions given to the jury for this offense were that the SEC needed to prove: (1) Sharp or others "were knowingly [or] recklessly violating [Rule 10(b)(5) and Section 17(a)(1)], and for 17(a)(3), were negligently violating the securities law"; (2) "that Ms. Gasarch understood that her role or conduct was part of an overall activity that was improper"; and (3) "that Gasarch <u>knowingly or recklessly</u> provided substantial assistance to the

- 28 -

violation." (Emphasis added).[18] These elements largely map onto those we've previously identified for this offense (minus the "recklessly" standard that hadn't been added yet). See SEC v. Tambone, 550 F.3d 106, 144 (1st Cir. 2008), reh'g en banc granted, opinion withdrawn, 573 F.3d 54, 55 (1st Cir. 2009), opinion reinstated in relevant part on reh'g, 597 F.3d 436, 450 (1st Cir. 2010) (en banc).

Gasarch frames the instructions as failing to levy a requirement that she "ha[d] knowledge of the specific securities violation by the primary violator." But her claim overlooks the first and third elements of the challenged jury instructions (which probably explains why she only quoted the second element in her brief). The jury almost certainly considered Gasarch's knowledge, or reckless disregard, of the primary violations because the instructions said so explicitly and listed those primary violations. See Davignon, 524 F.3d at 109.

Before departing from this issue, we recognize that Gasarch also raises an argument related to the district court's use of Apuzzo in its motion to dismiss decision. See Sharp I, 626 F. Supp. 3d at 398. In one clause of her opening brief, Gasarch says "[d]espite the trial judge adopting the Apuzzo standard in

_____

[18] The court also defined "substantial assistance" as meaning that "Gasarch in some way associated herself with the venture, that she participated in it as something that she wished to bring about, and that she sought by her action to make it succeed."

- 29 -

his opinion on the motions to dismiss, the judge charged the jury on the second element as follows . . ." and proceeds to quote the instruction we've already produced for the reader.  Then, in her reply brief, Gasarch claims that the SEC "completely ignores" her argument that "the district court specifically adopted the holding in Apuzzo."  But, unlike her opening brief, Gasarch's reply brief goes a half-step further and cites two cases that invoke the "law of the case doctrine."  See Arizona v. California, 460 U.S. 605, 618 (1983) (explaining that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"); United States v. Matthews, 643 F.3d 9, 12 (1st Cir. 2011) (same).

Yet from our perspective, the SEC's "complete ignoring" of Gasarch's law of the case argument should've come as no surprise to Gasarch considering she (at most) superficially hinted at an argument under this doctrine in her opening brief.  Our court has made clear that we do not consider arguments raised for the first time in an appellant's reply brief as such sandbagging "deprives the appellee of an opportunity to respond in writing on the issue." Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015); see Seafreeze Shoreside, Inc. v. U.S. Dep't of Interior, 123 F.4th 1, 23 n.9 (1st Cir. 2024).  Therefore, Gasarch has waived this claim.

In sum, we conclude the district court did not err in its jury instructions related to Gasarch's aiding and abetting liability.

### C. Sufficiency of the Evidence

In the final portion of our trial-related appellate contentions, Gasarch asserts that no reasonable jury could have found her liable as either a primary violator or an aider and abettor of securities laws violations based on the evidence presented by the SEC. Because Gasarch properly moved for judgement as a matter of law before the district court, we review her challenge de novo. SEC v. Lemelson, 57 F.4th 17, 23 (1st Cir. 2023).

Throughout our de novo review, we "construe facts in the light most favorable to the jury verdict, draw any inferences in favor of the non-movant, and abstain from evaluating the credibility of the witnesses or the weight of the evidence." Id. (quoting Suero-Algarín v. CMT Hosp. Hima San Pablo Caguas, 957 F.3d 30, 37 (1st Cir. 2020)). And in the end, we must ask whether a rational jury could have found in the SEC's favor and set aside the verdict "only if the jury failed to reach the only result permitted by the evidence." Id. (quoting Quiles-Quiles v. Henderson, 439 F.3d 1, 4 (1st Cir. 2006)).

## 1. Primary Violator

Gasarch claims that "there is no evidence that [she] was involved at all in trading securities or making any statements used by the investing public.  She made no representations at all." And while Gasarch may have been the owner of a nominee company used to perpetuate the fraudulent scheme, it was really Sharp, not her, who controlled that nominee company.  Additionally, Gasarch claims that "[t]here is not a scintilla of evidence" that she had the "requisite scienter" to violate any of the SEC provisions for which she was charged, nor was there evidence that she "should have known of the [SEC's] five percent rule and the ban against 'pump and dump' and ignored it."  Putting aside her flirtation with waiver by presenting her claims in such conclusory fashion, we disagree with her contentions, at least as we understand them.

The jury found that Gasarch violated Section 17(a)(3) of the Securities Act which, to repeat, makes it "unlawful for any person in the offer or sale of any securities . . . directly or indirectly . . . to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(3).  Contrary to Gasarch's comment on the "requisite scienter," the Supreme Court determined nearly half a century ago that Section 17(a)(3) does not have a scienter requirement.  See Aaron v. SEC, 446 U.S. 680, 697 (1980). Instead, the statute "quite plainly focuses upon the effect of

particular conduct on members of the investing public, rather than upon the culpability of the person responsible." Id. We have also said as much, that "[p]roof of scienter is required to establish violations of . . . [S]ection 17(a)(1), but negligence is sufficient to establish liability under [S]ection 17(a)(2) or [S]ection 17(a)(3)." SEC v. Johnston, 986 F.3d 63, 74 (1st Cir. 2021). So, because Gasarch's argument is incorrect off the jump in that the SEC did not need to provide evidence that she knew about the securities violations she committed, we need not consider whether the evidence was sufficient to prove a non-existent element.[19]

Next, Gasarch claims that the SEC failed to produce any evidence that she was involved in any security trading or that she made any statements used by the investing public. The latter point is a dead letter, as Gasarch was found liable under Section 17(a)(3) for her fraudulent conduct and not for making untrue statements -- a possible violation of the separate but related Section 17(a)(2). See 15 U.S.C. § 77q(a)(2); see also Lorenzo v. SEC, 587 U.S. 71, 77 (2019) (discussing the differences between Section 17(a)'s three provisions). Having separated the wheat from the chaff, we are left with Gasarch's claim that the SEC

_____

[19] Gasarch seemingly concedes that the SEC only needed to demonstrate negligence in her reply brief, but this peace between the parties soon crumbled as Gasarch's arguments continue to push a higher, and incorrect, knowledge scienter.

failed to prove her involvement in any securities trading, notwithstanding her ownership of a nominee company undeniably involved in the fraudulent scheme.

From the SEC's perspective, Gasarch's appellate asseveration again misses the mark because Section 17(a)(3) covers a wide swath of fraudulent behavior beyond just making transactions. To continue, the SEC also says that Gasarch's role as the owner of a nominee company that was used to trade shares of nine problematic stocks ("problematic" being our shorthand for stocks that were pumped and dumped and whose ownership was impermissibly concealed) and her "other deceptive conduct in connection with the scheme" support the jury's verdict.

We first recognize that, contrary to Gasarch's sweeping statement, the SEC did not need to submit evidence that Gasarch traded securities for a jury to find her liable under Section 17(a)(3). Cf. Johnston, 986 F.3d at 76 (finding sufficient evidence of claims under Sections 17(a)(1)-(3) based on misleading statements made to investors unrelated to trading). Rather, "[a] defendant may be liable under [Section] 17(a)(3) if [s]he undertook a deceptive scheme or course of conduct that went beyond . . . misrepresentations." SEC v. Bio Def. Corp., No. 12-11669, 2019 WL 7578525, at *25 (D. Mass. Sept. 6, 2019) (cleaned up), aff'd sub nom. SEC v. Morrone, 997 F.3d 52, 62 (1st Cir. 2021).

- 34 -

The SEC provided sufficient evidence from which a reasonable jury could conclude that Gasarch was "engaged in a transaction, practice, or course of business which operates . . . as a fraud or deceit upon the purchaser of a security." Morrone, 997 F.3d at 62 (citation modified). On a general level, encrypted email correspondence revealed Gasarch's centrality to the scheme as she was considered "the master of finance" within the Sharp Group. And in this role, she wired money across the globe, making sure it got where it needed to go. Digging down a bit deeper into the scheme, SEC witness Knox explained that Gasarch would doctor or create invoices (sometimes incorrectly, which Knox would have to point out and correct) to cover up wire transfers and give them the appearance of legitimacy. For example, the SEC entered into evidence a fax sent to Knox from one of the Sharp Group's nominee companies and an invoice from a large law firm. The fax requested that Knox wire $129,000 to a Citibank account with the beneficiary set as the law firm requesting payment. The SEC presented these documents alongside their metadata records that showed Gasarch as the author of the law firm invoice and as the last editor of both documents just before they were sent to Knox. Moreover, Knox testified that this invoice was not a normal invoice from this law firm, that it appeared to him to be a "patchwork" with the initial recipient altered (as in, the law firm did not provide these services to this Sharp Group

nominee), and that it "looked fake . . . like something from a photoshop."

Then we have the SEC's evidence regarding Gasarch's ownership of one of the Sharp Group's nominee companies that traded in nine of the problematic issuers: Peregrine Capital (formerly known as Peaceful Lion, the name we'll be using). The Peaceful Lion account at Knox's firm remitted funds from stock sales to various individuals and entities, including at one point appellant Kelln's doctor to pay a bill. While Gasarch claims that "every witness . . . said that Fred Sharp controlled" this nominee company, Knox testified to the opposite. Knox said the majority of payment directions pertaining to the Peaceful Lion account came from Gasarch for the benefit of unnamed and hidden individuals. Therefore, the SEC presented evidence that Gasarch actively "engaged" in the deceptive scheme by directing the transfer of funds from the nominee account to the true beneficial owners of the stock. See Bio Def. Corp., 2019 WL 7578525, at *25.

Gasarch's claim that she was only an administrative assistant who had no reason to know fraudulent conduct was afoot doesn't fit the facts we have before us. More importantly, her preferred verdict was not "the only result permitted by the evidence." Lemelson, 57 F.4th at 23 (citation modified). Between Gasarch's role as the "master of finance" for the Sharp Group, her doctoring of documents to create an air of legitimacy, and her

- 36 -

ownership of one of the nominee companies used to perpetuate the fraudulent scheme, there was sufficient evidence before the jury to conclude that Gasarch was engaged in a course of business to defraud and deceive investors.

## 2. Aiding and Abetting

In addition to finding Gasarch a primary violator of Section 17(a)(3), the jury also found Gasarch liable for aiding and abetting violations of "Sections 17(a)(1), Sections 17(a)(3) of the Securities Act of 1933, or Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(a) and (c)." Gasarch again challenges the sufficiency of the evidence presented by the SEC to support the jury's verdict, similarly asserting (rather than arguing through our caselaw) that the evidence did not establish that she knew the Sharp Group engaged in securities violations or that she provided substantial assistance to those violations. Distilled, Gasarch claims she "was a functionary who sat in the reception area of an office suite" and nothing more.

Much of the evidence the SEC cites to support the jury's aiding and abetting verdict mirrors the evidence it cited to support the primary violation verdict under Section 17(a)(3). However, as we mentioned in our prior discussion of the jury instructions for aiding and abetting liability, this statute requires proof that Gasarch knowingly or recklessly provided substantial assistance to the fraudulent scheme. See 15 U.S.C.

- 37 -

§ 78t(e); see also Lorenzo, 587 U.S. at 82.  So, to satisfy this higher scienter standard, the SEC highlights additional evidence produced at trial in the form of encrypted messages which we will now walk the reader through.  See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002) ("[T]he plaintiff may combine various facts and circumstances indicating fraudulent intent to show a strong inference of scienter.").

As we discussed when introducing the details of this pump and dump scheme, the Sharp Group paid promotors to pump up the value of their clandestine holdings.  In one message thread discussing promotions and payments, Gasarch followed up from a wire request by asking "[i]s for promotion? [sic] . . . I need to find a safe account for wire, if this is a promotion."  In another text thread presented at trial, Gasarch received a wire request and responded that, when paying for promotions, she couldn't send too much at a time and that she needed to use a specific bank for the wire.  In that same conversation, when asked if she could send promotion funding sooner, she said she needed to wait five days because "I play safe."  In her reply brief, Gasarch takes issue with the SEC's reliance on this evidence without "even attempt[ing] to decipher what [Gasarch] meant in 2014 by the word 'safe.'"  Taken in the light most favorable to the SEC, see, e.g., United States v. Condron, 98 F.4th 1, 18 (1st Cir. 2024), the jury could have reasonably concluded "safe" accounts and conduct implicitly

acknowledged the existence of "unsafe" accounts and conduct. As in, Gasarch knew that she couldn't use certain accounts or act too quickly when paying stock promoters -- a critical step for the pump and dump schemes' success. See id. at 19 (holding a jury could reasonably infer the defendant's intent to defraud based on circumstantial evidence).

The SEC also presented an encrypted email chain between Gasarch and Sharp (using the code names "WIRES" and "BOND") where the two discussed Sharp's concern over apparent money laundering. In that conversation, Sharp asked Gasarch to explain how a disbursement of cash to a client was "a legitimate payment" and wanted Gasarch to prepare a response in case the police ever came snooping around. Gasarch responded with the suggestion that they call the payment a loan, and that they could have the client sign a loan agreement to bolster appearances.

This evidence, in addition to what we've already recounted regarding Gasarch's near-decade long role as the "master of finance" who handled the Sharp Group's wire transfers, is sufficient for a reasonable jury to conclude that she knowingly or recklessly provided substantial assistance to the commission of securities law violations at the Sharp Group.

### III. INTERMISSION

To recap, we affirm the district court's evidentiary rulings regarding the Q system, find no error in the district

court's jury instructions as given, and ultimately leave Gasarch and Friesen's jury verdicts untouched. With the trial matters in the rear view, we may loop back in appellants Veldhuis, Sexton, and Kelln and proceed to the second half of this collective appeal focusing on the remedial measures ordered by the district court.

### IV. ACT TWO

The SEC sought three classes of remedies before the district court: (1) disgorgement and prejudgment interest against all appellants in varying amounts tailored to the profits they received; (2) civil penalties in varying amounts likewise tailored to each appellant's participation in the scheme; and (3) injunctive relief against Sexton, Friesen, and Gasarch. See Sharp II, 737 F. Supp. 3d at 73. After a thorough review of the case and the evidence submitted, the district court found appellants jointly and severally liable with Sharp for disgorgement awards capped at the following amounts:

- Gasarch - $2,522,367

- Kelln - $1,582,785

- Sexton - $17,367,474

- Veldhuis - $13,289,897

- Friesen - $11,846,176

Id. at 95. The court did not impose prejudgment interest on the disgorgement awards. Id. In addition to disgorgement, appellants were also ordered to pay civil penalties in the following amounts:

- Gasarch - $296,651

- Kelln - $904,078

- Sexton - $1,562,603

- Veldhuis - $1,562,603

- Friesen - $1,562,603

Id. And beyond monetary remedies, the district court also issued several injunctions against appellants. At a general level (we'll get to the nitty-gritty level later), the court issued: (1) permanent injunctions barring appellants from violating securities laws in the future; (2) specific, conduct-based injunctions preventing appellants from professionally engaging in the national securities market; and (3) injunctions barring appellants from participating in future penny stock offerings. Id. at 77-79.

We will discuss each of these remedies levied on appellants, as well as their arguments as to why they cannot remain in place, starting with disgorgement.

## A. Disgorgement

Appellants collectively challenge the district court's disgorgement award in practically every conceivable manner. We

will address each claim in turn, while scrutinizing the district court's decision and reasoning throughout that process. But first, a bit more on what we mean by disgorgement.

Disgorgement is an equitable remedy designed "to strip wrongdoers of their ill-gotten gains" and compensate their victims. Liu v. SEC, 591 U.S. 71, 79 (2020). Congress has authorized the SEC to seek, and district courts to grant, "disgorgement . . . of any unjust enrichment by the person who received such unjust enrichment as a result of such violation." 15 U.S.C. § 78u(d)(3)(A)(ii); see also id. § 78u(d)(7). "Disgorgement may only be ordered in an amount that is a reasonable approximation of profits causally connected to the underlying violation." SEC v. Commonwealth Equity Servs., LLC, 133 F.4th 152, 171 (1st Cir. 2025) (citation modified). And, in seeking this remedy, the SEC bears the burden of showing that its request is a reasonable approximation of the defendant's unjust enrichment. Id. Once the SEC has established a reasonable approximation, "the burden shifts to the defendant to demonstrate that the amount of disgorgement is not a reasonable approximation." SEC v. Navellier & Assocs., Inc., 108 F.4th 19, 42 (1st Cir. 2024) (citation modified).

As we mentioned, between our five appellants, we've got a lot of ground to cover starting with the availability of the award, a determination we review de novo. Id. at 41; see also In

re PHC, Inc. S'holder Litig., 894 F.3d 419, 435 (1st Cir. 2018) ("The availability of an equitable remedy presents a question of law engendering de novo review.").

### 1. Availability of Disgorgement

Disgorgement is a "profit-based measure of unjust enrichment which reflects the foundational principle that it would be inequitable that a wrongdoer should make a profit out of their own wrong." Navellier & Assocs., Inc., 108 F.4th at 41 (citation modified). Thus, the award of disgorgement is "tethered to a wrongdoer's net unlawful profits." Id. (quoting Liu, 591 U.S. at 80).

Appellants seek an early victory in arguing that once the district court decided that it couldn't determine the amount of ill-gotten gains each appellant received, disgorgement was off the table. In other words, sans proof of profits there cannot be a court order to return any profits.

We disagree with appellants' view of (1) the evidence here of ill-gotten profits and (2) the district court's role in ordering disgorgement. Starting with argument one, we note that in a declaration to the district court, the SEC's expert witness Ryan Murphy explained how he combed through the Q system and other available evidence to calculate each appellant's proceeds derived from sales of the fourteen problematic stocks at issue in this case. Furthermore, as we mentioned earlier, Murphy verified the

transactional data within the Q system by comparing it to independent brokerage records, thereby confirming the existence of profits.  So, with that evidence of ill-gotten gains on the table, like the district court and in our de novo review, we agree that "disgorgement was available in principle."  Navellier & Assocs., Inc., 108 F.4th at 41 (quoting In re PHC, Inc., 894 F.3d at 437).

That said, in raising this disgorgement-error argument, we recognize appellants' deeper concern to be the district court's decision to order appellants jointly and severally liable with ringleader Sharp for their disgorgement awards.  However, unlike the legal question of whether disgorgement is available, see id. at 41, we review challenges to the substance of the district court's disgorgement order, including the decision to impose joint and several liability, for abuse of discretion, id. at 42.  And that decision is where we shift our focus to next.

## 2. Joint and Several Liability

When it came time to award disgorgement, the district court faced a dilemma.  Q system data, verified by external brokerage records and expert testimony, established that ill-gotten gains were, in fact, generated by the appellants' pump and dump schemes.  Sharp II, 737 F. Supp. 3d at 93-94.  However, the precise moment of receipt for those ill-gotten gains was not always as clear.  Id. at 91 (considering "the lack of bank records showing actual receipt of funds").  The evidence showed illicit

proceeds allocated to appellants' individual Q accounts and appellants spending some of those proceeds, but not all. Therefore, from the district court's point of view, it was entirely possible that "at least a portion of the ill-gotten gains may have never reached the pockets of individual [appellants]." Id. at 94.

After considering the evidence, the district court decided that the balance of equities favored awarding disgorgement awards in the amounts sought by the SEC. Id. at 91. But the court added a caveat to the SEC's initial request and held each appellant jointly and severally liable with Fred Sharp (who handled all profits until distributed) for their disgorgement amounts. Id. at 92. The court justified its decision by explaining that joint and several liability was appropriate in this case because appellants' ill-gotten gains were the product of "concerted wrongdoing." Id. More specifically, the court found appellants were co-conspirators in a hub-and-spoke model with Sharp operating at the hub.[20] Id. But, despite finding appellants jointly and severally liable with Sharp, the court nevertheless capped the amount that could be disgorged from each appellant at the amount initially requested by

---

[20] The hub-and-spoke model of conspiracy (named after the familiar design of a wheel) involves "a central mastermind, or 'hub,' [who] controls numerous 'spokes,' or secondary co-conspirators. These co-conspirators participate in independent transactions with the individual or group of individuals at the 'hub' that collectively further a single, illegal enterprise." United States v. Newton, 326 F.3d 253, 255 n.2 (1st Cir. 2003) (citing Kotteakos v. United States, 328 U.S. 750, 754-55 (1946)).

the SEC, based on the Q system data. Id. at 92-93. The designations, therefore, did not expand any appellant's liability beyond the SEC's request.

Appellants now band together and argue the district court abused its discretion by holding them jointly and severally liable with Sharp. To appellants, the district court's decision to impose joint and several liability inexplicably belies the "default rule" of individual liability for disgorgement awards. The SEC, for its part, concedes that it never asked the district court to find appellants jointly and severally liable and that it would not object to striking these designations while keeping appellants individually liable for the same amounts. Alternatively, the SEC defends the district court's determination by arguing appellants' "long-running conspiracy to defraud investors" amounts to concerted wrongdoing suitable of joint and several disgorgement awards.

At this juncture, we must digress briefly to explain why we cannot accept the SEC's attempted olive branch. The SEC says that the joint and several liability designations are unnecessary, and that we could strike them while leaving the disgorgement awards otherwise intact. Appellants disagree and argue that the disgorgement awards could not have been imposed without the court's joint and several designations. When issuing its decision, the court first described joint and several liability as the "[t]hird

and most important[]" factor "favor[ing] the awarding of the disgorgement amounts requested by the SEC." Sharp II, 737 F. Supp. 3d at 92 (first quote); id. at 91 (second quote). It then decided that the imposition of prejudgment interest was not equitable because it had already awarded disgorgement and "actual accrual to each of the Defendants [could not] be shown." Id. at 94. The court repeated this sentiment, professing that there was an "absence of a precise determination as to the amount of ill-gotten gains actually obtained by the individual co-conspirators in the various conspiracies." Id. at 95. After careful review of the court's decision, we take the court to mean that the evidence produced by the SEC was insufficient to award disgorgement on a purely individualized basis beyond what the SEC had proven was actually distributed to each appellant and, therefore, it would not have awarded disgorgement but for the joint and several liability designations.

Regardless, we may decline the SEC's suggestion and refrain from deciding whether the designations can be struck (or, put differently, their necessity) because the district court did not abuse its discretion in fashioning these equitable remedies. See SEC v. Sargent, 329 F.3d 34, 41 (1st Cir. 2003) (deferring to a district court's equitable remedy). Here's why.

The default rule referenced by appellants (and recognized by the district court, Sharp II, 737 F. Supp. 3d at 92

n.16) comes from the Supreme Court's pronouncement in Liu v. SEC, 591 U.S. 71 (2020). There, the Court elucidated that joint and several liability is disfavored when awarding equitable remedies because it risks transforming such remedies into penalties by holding defendants liable for profits "accrued to another, and in which they have no participation." Liu, 591 U.S. at 90 (citation modified). However, when making this pronouncement, the Court also unequivocally left open the possibility of joint liability for "partners engaged in concerted wrongdoing." Id. at 90-91 (citing Ambler v. Whipple, 87 U.S. 546, 559 (1874)). Furthermore, our court has previously examined, and upheld, the application of joint and several liability for a disgorgement award where appellants engaged in concerted wrongdoing. See Navellier & Assocs., Inc., 108 F.4th at 43 (citing Liu, 591 U.S. at 90). And here, we cannot conclude that the district court abused its discretion in applying this limited and recognized exception.

In its disgorgement order, the district court found that each appellant had conspired with Sharp to commit securities fraud and had received illicit gains as a result. Sharp II, 737 F. Supp. 3d at 92. For all the ink spilled over joint and several liability in appellants' briefing, no one broaches the question of how or why involvement in a conspiracy to commit securities fraud does not constitute "concerted wrongdoing" between co-conspirators. We struggle to think of a clearer example. See

- 48 -

SEC v. Johnson, 43 F.4th 382, 392-93 (4th Cir. 2022) (applying Liu's "concerted wrongdoing" exception to an entity and control person who shared "coordinated roles in perpetrating the scheme"); see also United States v. Ochoa, 58 F.4th 556, 561 (1st Cir. 2023) (explaining the rationale behind joint and several restitution orders for co-conspirators who defrauded investors).

Accordingly, we reject appellants' position that the district court abused its discretion by deviating from the default rule for disgorgement awards in this case. As all parties recognize, instances of concerted wrongdoing can rebut the general rule disfavoring joint and several disgorgement awards, see Liu 591 U.S. at 90, and no one has suggested that the district court erred in finding the existence of a hub-and-spoke conspiracy which, in turn, supports its application of the concerted wrongdoing exception.

Appellants' remaining arguments are unavailing. Each appellant compares their circumstances to those presented in a similar matter before our court. In BioPoint, Inc. v. Dickhaut, 110 F.4th 337, 353 (1st Cir. 2024), we concluded the district court abused its discretion in holding Dickhaut, "an individual, non-owner, non-director employee," jointly and severally liable with his profiting corporate employer. There, we observed "[m]ultiple red flags identified in Liu" disfavoring joint and several liability. Id. at 352. It was undisputed that the profits

attributable to the illicit scheme were not commingled and accrued solely to Catapult (Dickhaut's employer) rather than to Dickhaut. Id. We concluded that Dickhaut's high-ranking position and mere collaboration with the corporate entity, without a determination of how much he benefitted from the scheme, made the joint and several disgorgement award inconsistent with equitable principles because it ordered Dickhaut to repay profits reaped by another. Id. at 353.

Returning to the issue at hand, we are in a far better position to determine appellants' receipt of ill-gotten gains than we were in BioPoint. Here, the district court did the appropriate leg work to determine that each appellant enjoyed the fruits of the scheme based on the amounts allocated to their individual Q accounts. The evidence established that the funds credited to appellants' Q accounts were held by the Sharp Group until requested in cash or wired to their desired destinations. Moreover, the caps imposed by the district court ensure that each appellant only pays up to the amount allocated in their individual Q account and, thus, "not [profits] which have accrued to another, and in which they have no participation." Liu, 591 U.S. at 90 (citation modified); cf. BioPoint, 110 F.4th at 353 (reversing a determination that ran afoul of Liu). Therefore, appellants' state of affairs presents meaningful differences from those red flags identified in BioPoint, and the imposition of joint and several

liability did not transform this "equitable profits-focused remedy into a penalty."  See Liu, 591 U.S. at 90.

Before departing from this issue, we must address one more appellate contention raised only in Veldhuis, Sexton, and Kelln's opening brief.[21]  These appellants assert that it was legal error for the court to impose joint and several liability sua sponte.[22]  We disagree.

Appellants inform us that "[s]ua sponte remedies are generally disfavored," and that the SEC never requested this designation at any stage of litigation.  The SEC does not claim to

---

[21] Appellants Veldhuis, Sexton, and Kelln also argue that joint and several liability was improper because a default judgment and disgorgement order had already been imposed against Sharp, and the district court lacked the authority to expand that judgment (by holding him jointly and severally liable) without request from the SEC and without notice to Sharp.  The problem for appellants is that this is a claim for Sharp and Sharp only, considering that only his default judgment is being amended and the joint and several liability designations do not prejudice appellants in any way (keep this in mind).  Thus, appellants have no basis for raising this argument.

And, we hasten to add that the default judgment and disgorgement order against Sharp remained amendable by the district court because that judgment resolved "fewer than all the claims or the rights and liabilities of fewer than all the parties" involved and "d[id] not end the action."  Fed. R. Civ. P. 54(b); see also Fed. R. Civ. P. 55(c), Advisory Committee Notes Amendment 2015 ("Until final judgment is entered, Rule 54(b) allows revision of the default judgment at any time.").

[22] Sua sponte "is Latin for 'of one's one accord' and legalese for actions taken by a court without prompting by a party." Calderón-Amézquita v. Rivera-Cruz, 158 F.4th 54, 65 (1st Cir. 2025).

- 51 -

have raised the issue to the district court, but it "does not believe the designation prejudices the appellants in any way." Moreover, the SEC describes the district court's sua sponte determination as an exercise in caution, that the court was merely "dotting [its] i's and crossing [its] t's."

This precise question has escaped our review thus far. We'll begin our analysis with a general observation borrowed from a different sua sponte-related question: the authority to act sua sponte "should be exercised sparingly and with great circumspection." McCoy v. Town of Pittsfield, 59 F.4th 497, 504 (1st Cir. 2023) (citation modified). Sticking with generalities involving sua sponte decisions (which are all appellants have given us to work with), our chief concern is whether the parties were afforded adequate notice that the district court might act and whether any lack of notice was prejudicial. Cf. Calderón-Amézquita v. Rivera-Cruz, 158 F.4th 54, 67 (1st Cir. 2025) (reviewing a district court's sua sponte decision to convert a motion to dismiss into a motion for summary judgment).

As things played out here, even if appellants lacked adequate notice that joint and several liability was on the table, the district court's sua sponte designations did not prejudice appellants. The SEC's motion for remedies laid out its reasoning and the amounts it sought in disgorgement. The district court then ordered disgorgement awards capped at those requested

amounts.  <u>Sharp II</u>, 737 F. Supp. 3d at 93.  Its sua sponte decision could only benefit appellants to the extent Sharp picks up any balance left on the remedial tab.  Moreover, appellants have not argued that they would have done anything differently had they been provided notice that joint and several liability was an option.  <u>Cf.</u> <u>Calderón-Amézquita</u>, 158 F.4th at 70 (finding prejudice, in part, because appellant presented the district court with a newly-material piece of evidence one day after a sua sponte ruling).  Therefore, for the limited purposes of these designations, as it pertains to these appellants, the district court did not abuse its discretion in imposing joint and several liability sua sponte.[23]

*

Considering the district court's prudent analysis and our reasoning just offered, we conclude, based on the totality of the circumstances here, that the court did not abuse its discretion in holding appellants jointly and severally liable for their disgorgement awards.  <u>See</u> <u>Navellier & Assocs., Inc.</u>, 108 F.4th at 43-44.

_____

[23] To remove any residual doubt, we expressly decline to wade through the meandering possibilities where a district court might abuse its discretion in ordering joint and several liability for a disgorgement award sua sponte, to the extent such an order could prejudice future litigants.

### 3. Disgorgement Amounts

With the matter of joint and several liability put to rest, the question of whether the district court abused its discretion in calculating the amounts to be disgorged requires our immediate attention.  To remind the reader, "disgorgement may only be ordered in an amount that is a reasonable approximation of profits causally connected to the underlying violation." Commonwealth Equity Servs., LLC, 133 F.4th at 171 (citation modified).  And it is the SEC's burden to prove its request is a reasonable approximation of the defendant's ill-gotten gains.  Id. (citing SEC v. Happ, 392 F.3d 12, 31 (1st Cir. 2004)).  But, once the SEC has established its reasonable approximation, "the burden shifts to the defendant to demonstrate that the amount of disgorgement is not a reasonable approximation."  Navellier & Assocs., Inc., 108 F.4th at 42 (quoting Happ, 392 F.3d at 31).  Lastly -- and critical to our forthcoming discourse -- "[t]he risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty."  Id. (quoting Happ, 392 F.3d at 31).

For the most part, appellants' arguments on this front resemble one another sufficiently to be collectively considered. But to the extent they differ, we address those individualized concerns next.  Appellants call in unison the refrain that the SEC failed to provide any evidence that they "actually received" the

funds at issue. To support their position on disgorgement, they recite the district court's seemingly contradictory reasoning for denying prejudgment interest: that the Q system evidence "does not show that ill-gotten gains have been obtained and retained by the individual [appellants], much less in the amounts requested by the SEC." Sharp II, 737 F. Supp. 3d at 94. Likewise, each appellant disparages the district court's order because the SEC failed to produce any bank records confirming the funds were disbursed from the Q system and reached appellants.[24]

When the district court faced the issue of actual receipt, it acknowledged the missing links of evidence that would have fortified the SEC's requests. See id. at 91. However, the district court concluded "that the balance of equities favor[ed] the awarding of the disgorgement amounts requested by the SEC." Id. The court reasoned that the SEC had demonstrated the "Q data's high degree of internal accuracy as to the proceeds generated" which "counsel[ed] a similar finding of accuracy as to its figures regarding the money going into the [appellants'] personal Q accounts." Id. In addition, the court applied the requisite burden-shifting framework, first holding the SEC to its required

---

[24] We note here that Veldhuis, Sexton, and Kelln also challenged the district court's order from the angle that it relied on inadmissible hearsay -- the Q system evidence. For the reasons given above, we reiterate the district court did not err in admitting and relying on this evidence.

- 55 -

showing before concluding appellants had failed to mount a satisfactory rebuttal. Id. From our review, the district court did not abuse its discretion in weighing the equities and applying our burden-shifting framework to the SEC's disgorgement requests. We'll break down our conclusion step-by-step.

The SEC first needed to produce "a reasonable approximation of profits causally connected to the underlying violation." Commonwealth Equity Servs., 133 F.4th at 171 (citation modified). To do so, it synthesized the Sharp Group's internal ledger: the Q system. To remind the reader, the Q system data contained two important metrics: transactional data and allocation data. The transactional data (verified by external brokerage records) recorded transactions in the fourteen problematic stocks and how much money was generated. The allocation data then showed where the generated money went and, more importantly, to whom.

In its motion for remedies, the SEC reported the amounts allocated to each appellant's individual Q account (designated by code names). It also took the crucial step of recounting the evidence of actual disbursements made at different appellants' requests and denoting where those requests later appeared as charges in the Q system. We see this evidence as the district court did, verifying that the individual Q accounts functioned "just like a bank account would." Sharp II, 737 F. Supp. 3d at 91. Proceeds from illicit trades were credited to appellants' Q

accounts from which they could request cash, wire transfers, and even monthly account statements. Accordingly, the SEC met its burden to provide a "<u>reasonable approximation</u> of profits causally connected to the violation." <u>Navellier & Assocs., Inc.</u>, 108 F.4th at 43.

Once the SEC met its burden, the duty to produce evidence to the contrary thus shifted to appellants, <u>id.</u>, but they declined the opportunity to do so. See <u>Sharp II</u>, 737 F. Supp. 3d at 91. Instead, below and on appeal, appellants stake their claim on the SEC's failure to meet its initial burden by relying on the Q system evidence. Appellants did not, for example, produce evidence that the amounts allocated to their Q accounts went to someone besides them or otherwise prove that they did not have access to the funds as the evidence suggests. The failure to do so left the disgorgement ball in their court, and allowed for the district court to permissibly order disgorgement in the amounts reasonably approximated by the SEC.

To tie a bow on this burden-shifting exercise, we remind the reader that "[t]he risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." <u>Navellier & Assocs., Inc.</u>, 108 F.4th at 42 (quoting <u>Happ</u>, 392 F.3d at 31). Sharp built his enterprise from the shadows of anonymity. He charged a lucrative price for his services and could do so because he reaped exorbitant returns

- 57 -

and kept his clients out of jail.  Knox testified that the scheme was designed to get clients cash or wire payments "without any records."  Our precedent and burden-shifting framework does not reward wrongdoers for successfully evading a paper trail.  See Happ, 392 F.3d at 31 ("[D]oubts are to be resolved against the defrauding party." (quoting SEC v. MacDonald, 699 F.2d 47, 55 (1st Cir. 1983))).  Once the SEC presented the district court with a reasonable approximation, even though it came from a unique source in the Q system, any lingering uncertainty fell on appellants as it was their scheme that built the uncertainty.

In making this determination, we also disagree with appellants' complaint that the SEC failed to produce bank records showing receipt of the ill-gotten gains.  Undeniably, a concrete stack of bank records would have made the district court's work (and ours) simpler, but the district court correctly noted that the production of bank records "has never been declared a sine qua non"[25] to finding an SEC disgorgement calculation reasonable. Sharp II, 737 F. Supp. 3d at 91 (citing SEC v. Lazare Indus., 294 F. App'x. 711, 715 (3d Cir. 2008)).  Indeed, speaking generally, the SEC has the authority to seek disgorgement of profits resulting from securities violations where individual bank records would not

---

[25] The phase "sine qua non" is Latin for something that is absolutely essential. For example, rebutting the SEC's reasonable approximation for disgorgement is a sine qua non to avoiding repayment.

necessarily assist their approximation. See Happ, 392 F.3d at 31-32 (calculating disgorgement for insider trading based on the difference in value of a stock from when it was sold to when the public became privy to the inside information). And for the calculation here, the SEC provided (1) records of the appellants' Q accounts along with (2) testimony from Knox about how disbursements occurred and (3) expert analysis from Murphy explaining the Q system and how the Q data allowed him to reasonably approximate the amounts to be disgorged. Cf. Lazare Indus., 294 F. App'x. at 715. Sometimes you've got to work with what you got, so long as what you've got amounts to a reasonable approximation. See Commonwealth Equity Servs., 133 F.4th at 172 (commenting that "'a reasonable approximation' obviously need not be exact").

### i. Gasarch

Moving on from appellants' concerted arguments, Gasarch offers a few more particularized claims tailored to her disgorgement award. These claims are a bit of a grab bag, sprinkled throughout her brief in collaboration with claims we've already discussed. But we recognize from her brief she asserts that the SEC failed to prove that any payments made to her were causally connected to the profits of the fraudulent scheme. Also problematic, from Gasarach's vantage, is that the individual Q account assigned to her by the SEC and the district court used the

code name "PEAC" or "PERE" while "every witness testified that [Gasarch] was referred to as 'WIRES.'"

To begin from that last point on code names, Gasarch's report of the record does not match reality. In an email thread produced by the SEC at trial, an unknown individual (code name "LION") sent a wire request to "WIRES" at 11:49 a.m. A prompt response (sent to code name "77") arrived from "PEACE" at 11:52 a.m. recommending caution when wiring too much money for promotions. The unknown individual (now back under code name "LION") carried on the conversation with "WIRES" at 11:56 a.m. And "PEACE" responded a minute later in a message sent to "77." Additionally, the SEC's expert Murphy stated that Gasarch was the initial recipient of this wire request from "LION."

Several individuals involved in the Sharp Group had more than one code name, and this exchange shows Gasarch coordinating wire transfers (her known role in the scheme) under both the code names "WIRES" and "PEACE." The conversation progressed seamlessly between four different code names (representing only two different people) in less than ten minutes.

Furthermore, in 2014, the Q account "PEAC" stopped receiving funds, but "PERE" readily took its place. Much like with "PEAC," Gasarch argues that the SEC failed to produce evidence of her connection to the "PERE" Q account. Again, the evidence tells a different story. First, in response to this claim before

the district court, the SEC presented a message from Sharp regarding the beneficiary of an amount of money (referenced as "9k" without clarifying the denomination as U.S. or Canadian dollars). In that February 2014 exchange (around when the "PEAC" account ceased receiving funds), an unknown party messaged Sharp "Beneficiary: yvonne gasarch, vancouver." Sharp replied, "Ok. Yvonne is account pere. I have amended mt for u." The SEC also provided a similar February 2014 exchange in which Sharp told an apparent broker "Wires to yvonne r charged to pere; have changed."

On this front, the SEC had even more ammo in its clip in the form of a message exchange between Sharp and Gasarch. Here's how that back and forth played out. Sharp reached out to Gasarch (in a "BOND" to "WIRES" communication, subject line "Q") asking "What is $55k tt to andrew kaplan from pere?" Gasarch replied, "It is mine." Perhaps unsatisfied by this answer, Sharp followed up, "Who is kaplan? What is wire for?" Gasarch responded, "This wire is he borrowed my money [sic], I will make $5k for 2 months." If the reader remains unconvinced, the SEC also provided a list of outgoing transfers from the "PEAC"/"PERE" Q account to businesses operated by Gasarch and/or her family members. In light of these evidentiary ties, we are not convinced that the district court "committed a meaningful error in judgment" by finding that Gasarch's disgorgement amount could be tethered to the profits

allocated in the "PEAC"/"PERE" Q account.  See Navellier & Assocs.,
Inc., 108 F.4th at 42 (citation modified).

With her connection to the "PEAC"/"PERE" Q account
established, we must next determine whether the SEC met its burden
of proving that the funds allocated to the account were causally
connected to securities fraud.  See Commonwealth Equity Servs.,
133 F.4th at 171.  To reiterate Gasarch's position in her words,
"[o]bviously, Mrs. Gasarch was a long-term employee and would be
entitled to salary and whatever bonuses determined by Mr. Sharp"
and "[c]learly, given the length of time and the number of accounts
and activities, Mrs. Gasarch was compensated for supporting Mr.
Sharp in his legitimate business activities."  The SEC, meanwhile,
says it proved that Gasarch was more than "an unwitting secretary
performing legitimate services," and that she worked at the hub of
the fraudulent scheme where she committed her own securities
violations while aiding and abetting others.  Furthermore, the SEC
emphasizes the fact that Gasarch did not present any evidence that
the money allocated to the "PEAC"/"PERE" Q account came from
legitimate services, and, therefore, she failed to rebut the SEC's
reasonable approximation.

Unlike her co-appellants, Gasarch's share of the pie
came from Sharp each month as a cut of the commission fees paid to
Sharp's Q account.  In other words, Sharp received a commission
from each transaction and then paid Gasarch from his commissions.

As we discussed in Act I, Gasarch committed securities violations and aided and abetted other violations, particularly Sharp's. Likewise, as the district court explained, the jury heard and rejected Gasarch's defense that she was merely an innocent secretary providing legitimate services to a fraudster. Sharp II, 737 F. Supp. 3d at 85. The fact that Sharp allocated profits derived from his commissions earned on fraudulent dealings to Gasarch's personal Q account satisfies the SEC's initial burden. Cf. Commonwealth Equity Servs., 133 F.4th at 172 (explaining why the SEC failed to meet its "reasonable approximation" burden due to an improper inference).

The glaring problem for Gasarch then becomes that she hasn't provided any evidence that the payments she received were not causally connected to her securities violations. See Navellier & Assocs., Inc., 108 F.4th at 43 ("Appellants failed to demonstrate that any of the advisory fees paid to them were unconnected to [the scheme]."). And while this dissociation might appear clear or obvious to Gasarch, we cannot agree. True, an employee can reasonably be expected to be paid for their work and even receive bonuses that their employer sees fitting. But here, the SEC has shown that her role with the Sharp Group perpetuated a complex securities fraud scheme, making it reasonable to conclude the payments she received (derived from commissions of the fraudulent transactions) amounted to ill-gotten gains. Gasarch had the

opportunity to present evidence to the contrary -- that at least some portion of her payments came from legitimate activity rather than wrongdoing -- but she did not. Cf. Commonwealth Equity Servs., 133 F.4th at 172 (outlining the defendant's countervailing arguments to the SEC's causation evidence).

### ii. Veldhuis, Sexton, and Kelln

Much like Gasarch, appellants Veldhuis, Sexton, and Kelln assert that the SEC never produced evidence that the stock transactions supporting the disgorgement awards "arose from any violation of the federal securities laws." And because this trio raises this argument divorced from any guiding legal precedent, we read their claim as challenging whether the evidence has established the requisite causal connection between the disgorgement awards and the underlying securities law violations. See Navellier & Assocs., Inc., 108 F.4th at 43. The SEC responds that the terms of Veldhuis and Sexton's consent judgments preclude this claim. And for Kelln, her consent judgment and the evidence produced at her co-appellants' trials readily supports the disgorgement award.

"It is uncontested that a party to a consent judgment is thereby deemed to waive any objections it has to matters within the scope of the judgment." Coughlin v. Regan, 768 F.2d 468, 469-70 (1st Cir. 1985); see also SEC v. Hallam, 42 F.4th 316, 325 (5th Cir. 2022) ("Ordinarily, a party may not appeal an issue

decided by a consent judgment."). After reviewing the scope of appellants' consent judgments entered by the district court, we find the arguments raised here waived via the terms of those judgments. Cf. Hallam, 42 F.4th at 326 (finding an argument against the SEC's ability to seek disgorgement foreclosed by the terms of a consent judgment).

In the consent judgments entered against Veldhuis, Sexton, and Kelln, each appellant agreed they would not contest liability under the claims filed by the SEC. The claims filed by the SEC explicitly set forth grounds for appellants' liability under Sections 17(a)(1) and (3) of the Securities Act, Sections 5(a) and 5(c) of the Securities Act, and Section 10(b) of the Exchange Act.[26] For Veldhuis and Sexton, those grounds were that they used the Sharp Group's services to obfuscate their ownership of shares in the fourteen problematic stocks later used to calculate their disgorgement awards. For Kelln, they were that she fraudulently concealed the identity of Sharp Group clients (who were selling large quantities of stock) by routinely splitting up shareholdings into less than five percent blocks to be held by various nominee entities. Accordingly, we see appellants' challenge that the SEC failed to prove that the disgorgement awards were causally connected to any violation of federal securities

_____

[26] The amended complaint also claimed Veldhuis and Sexton were liable for violating Section 13(d) of the Exchange Act.

- 65 -

laws as an impermissible attempt to contravene the agreements of their consent judgments.  See Hallam, 42 F.4th at 326.

Appellants' counters do not persuade us differently. They assert that they "simply agreed to not contest liability" and that they did not "agree to accept the SEC's allegations or otherwise bind themselves to the SEC's position."  But we cannot read the consent judgments so narrowly as to effectively entertain a backdoor trial on the merits.  See Swift & Co. v. United States, 276 U.S. 311, 324 (1928) (explaining that a decree "rendered by consent is always affirmed, without considering the merits of the cause" (citation modified)).  Once appellants agreed not to contest liability for the purposes of determining disgorgement, the district court acted within its discretion in accepting the grounds offered by the SEC in its complaint for establishing that liability, notwithstanding appellants' objection that the judgments lack certain language.  See SEC v. Engler, No. 1:20-cv-1625, 2022 WL 4596745, at *6 (E.D.N.Y. Sept. 30, 2022) ("When a defendant agrees to entry of a consent judgment with the SEC and agrees not to challenge the details of the SEC's complaint, courts accept the allegations in the complaint to be true when deciding the SEC's subsequent motion for monetary relief." (citation modified)); SEC v. Rooney, No. 11 C 8264, 2014 WL 3500301, at *2 (N.D. Ill. July 14, 2014) ("Pursuant to the consent judgment, the [c]ourt will accept the allegations in the complaint

as true for the purpose of determining appropriate relief."); see also Coughlin, 768 F.2d at 470 (holding that the right to appeal a consent judgment must be unequivocally reserved and "will not be presumed").

Likewise, we do not read the consent judgments' unequivocal preservation of the right to challenge any requested remedies as taking appellants' appellate claims beyond the scope of the consent judgments. The consent judgments' terms preserved appellants' ability to challenge the SEC's calculation of how much money arose from the sales in the fourteen stocks, or even better, permitted appellants to provide evidence rebutting the SEC's approximations. Appellants may not (despite their best efforts) argue that they were not "involved in the underlying transaction[s]" or that the transactions were legal. They've already agreed to those determinations and cannot fit that square liability peg into the round remedies hole. See Hallam, 42 F.4th at 325-26.

Thus, for all appellants, we conclude the district court did not err in calculating the disgorgement awards. The court aptly applied our burden-shifting framework and placed the risk of uncertainty on those responsible for any uncertainties that may remain. See Navellier & Assocs., Inc., 108 F.4th at 42.

## 4. Statute of Limitations

Next, all appellants argue that the applicable statute of limitations forecloses the SEC's disgorgement requests.[27] This argument comes down to whether five or ten years is the right window for calculating ill-gotten gains, which will be determined by the retroactive effect given to the National Defense Authorization Act ("NDAA") of 2021. See William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 6501, 134 Stat. 3388, 4626 (codified in part at 15 U.S.C. § 78u(d)(8)(A)). The district court discussed this matter at length, recognizing that it was one our court had yet to weigh in on. Sharp I, 626 F. Supp. 3d at 372. We review the district court's interpretation de novo. Lattab v. Ashcroft, 384 F.3d 8, 14 (1st Cir. 2004). Like our previous discussion, Gasarch offers a personal twist on this argument based on the unique results of her jury trial -- a claim we will address after explaining why we view the NDAA as applying retroactively to appellants' disgorgement awards.

To address appellants' arguments, we need to lay a bit more foundation. Appellants claim that "[a]t the time of all the

---

[27] Friesen states in a footnote of his brief that he joins his fellow appellants in this argument. Due to important distinctions between the circumstances of his appeal compared to Gasarch's, we assume he has joined Veldhuis, Sexton, and Kelln's position on the relevant statute of limitations.

conduct alleged in this case," the SEC had five years from the time its claim accrued to file actions seeking disgorgement. Appellants pull their preferred statute of limitations from 28 U.S.C. § 2462 and the Supreme Court's holding in Kokesh v. SEC, 581 U.S. 455, 467 (2017). But, in the interim between the Court's holding in Kokesh and when the SEC brought this enforcement action on August 5, 2021, Congress renewed the NDAA on January 1, 2021. Sharp I, 626 F. Supp. 3d at 371.

The amended statutory language states that the SEC may bring a claim for disgorgement "not later than 10 years after the latest date of the violation that gives rise to the action or proceeding in which the [SEC] seeks the claim if the violation involves conduct that violates" certain scienter-based offenses. 15 U.S.C. § 78u(d)(8)(A)(ii)(IV). And the NDAA amendments provide that this provision "shall apply with respect to any action or proceeding that is pending on, or commenced on or after," January 1, 2021. National Defense Authorization Act § 6501(b), 134 Stat. at 4626.

All parties agree that the NDAA established a new statute of limitations for the specific remedy of disgorgement for scienter-based securities violations; however, appellants resist a retroactive application of this statute for ill-gotten gains procured between five and ten years before the SEC initiated its claim. In support of this position, appellants emphasize the two

distinct ways Congress may alter a statute of limitations window retroactively. One method is for Congress to extend an existing statute of limitations pertaining to conduct still ripe for an enforcement action. But, appellants continue, the enforcement action here pertains to conduct that had gone stale by the time the SEC brought its case -- that is, conduct occurring more than five years before August 5, 2021, which they say would have been forgiven and forgotten if not for the retroactive extension of the statute of limitations. And appellants believe this latter category of retroactivity cannot be applied to the facts of this case given the relevant statutory language and our binding caselaw. The SEC reads the NDAA differently and informs us that every court to have considered this question has rejected appellants' position.

We need not conduct this inquiry in the dark, as our caselaw, our sister circuits, and the district court installed floodlights on our path forward. We first note that "[t]here is no doubt that Congress has the raw power to enact statutes that operate retroactively." Lattab, 384 F.3d at 14. However, we employ a presumption against giving retroactive effect to "statutes burdening private rights unless Congress ha[s] made clear its intent." Landgraf v. USI Film Prods., 511 U.S. 244, 270 (1994). To rebut this presumption, "a 'court must ask whether the new provision attaches new legal consequences to events completed

- 70 -

before its enactment,' thereby suggesting 'clear congressional intent authorizing retroactivity.'" SEC v. Ahmed, 72 F.4th 379, 400 (2d Cir. 2023) (quoting Landgraf, 511 U.S. at 269-70, 272). If Congress has made its retroactivity intentions clear, our inquiry ends, and we enforce the statute as written. Lattab, 384 F.3d at 14. But if the statute lacks a clear directive, we then ask "whether the application in question would have an impermissibly retroactive effect." Id. If it does, the presumption against retroactivity holds. Id. at 14-15.

The NDAA's disgorgement amendment contains an explicit retroactivity mandate that the ten-year statute of limitations "shall apply . . . to any action or proceeding that is pending on, or commenced on or after, the date of enactment of this Act." National Defense Authorization Act § 6501(b), 134 Stat. at 4626. As the SEC points out, and appellants do not dispute, courts have uniformly applied the ten-year window retroactively to actions that were pending on January 1, 2021. See Ahmed, 72 F.4th at 400; Hallam, 42 F.4th at 335. While appellants say the "pending on" language is irrelevant to our analysis, because the SEC undeniably commenced this action "after" January 1, 2021, this contention jumbles the question posed. Our task is to decide whether Congress clearly indicated its intent to give the NDAA a retroactive effect. Lattab, 384 F.3d at 14. And here, Congress did just that by extending the ten-year statute of limitations to all actions and

proceedings "pending on, or commenced on or after," January 1, 2021. National Defense Authorization Act § 6501(b), 134 Stat. at 4626; see Landgraf, 511 U.S. at 259-60 (using "shall apply to all proceedings pending on or commenced after the date of enactment" as an example of text carrying a retroactive effect); Ahmed, 72 F.4th at 400 (presuming Congress ascribed a particular meaning to this specific language as previously defined by the Supreme Court).

Furthermore, we agree with the district court's commonsense approach to this question. If we were to agree with appellants that the ten-year statute of limitations window only applied retroactively to actions pending on January 1, 2021, but not actions commenced on or after that date, we'd sign off on some less than logical outcomes. For instance, an SEC action under the same statutory scheme filed on December 31, 2020, could seek disgorgement for conduct occurring before January 1, 2016, but an identical action filed on January 2, 2021, targeting the same conduct would be untimely. Thus, if we were to adopt appellants' approach, the SEC could have sought disgorgement for pre-January 2016 conduct only if it filed the present action before the NDAA gave it authority to do so. We decline to read the statute as producing this absurd result. See Bostock v. Clayton Cnty., Ga., 590 U.S. 644, 789 n.4 (2020) (Kavanaugh, J., dissenting) (explaining that the absurdity canon "tells courts to avoid

construing a statute in a way that would lead to absurd consequences").

Appellants' remaining sub-arguments to the contrary do not sway us, either. Appellants compare the Sarbanes-Oxley Act with the NDAA to suggest that because other courts have found the former does not apply retroactively, neither should the latter. While appellants refer to the statutory text as "virtually identical," they overlook two crucial differences that operate against their claim. As we've already mentioned, the NDAA's retroactivity command references actions "pending on, or commenced on or after" the enactment date. National Defense Authorization Act § 6501(b), 134 Stat. at 4626. Meanwhile, the Sarbanes-Oxley Act provides that it "shall apply to all proceedings addressed by this section that are commenced on or after the date of enactment." Public Company Accounting Reform and Investor Protection Act of 2002, Pub. L. No. 107-204 § 804(b), 116 Stat. 745, 801 (codified in part at 28 U.S.C. § 1658(b)).[28] To perhaps state the obvious, the Sarbanes-Oxley Act provision does not explicitly cover actions pending on the date of enactment.

We do not point out this difference with our noses in the air. The use of "pending on, or commenced on or after" is the

_____

[28] For the purposes of today's argument, we assume without deciding that appellants are correct, and this Sarbanes-Oxley Act provision does not apply retroactively -- a question not before our court.

- 73 -

type of "unambiguous language that the Supreme Court has asserted would amount to an express retroactivity command." In re Enter. Mortg. Acceptance Co., Sec. Litig., 391 F.3d 401, 406-07 (2d Cir. 2004) (citing Landgraf, 511 U.S. at 255-56 & n.8, and Martin v. Hadix, 527 U.S. 343, 354 (1999)). In one case cited by appellants, the Second Circuit determined the Sarbanes-Oxley Act did not apply retroactively partially because it did not contain the "pending on" language that the NDAA has. See id. Furthermore, the Sarbanes-Oxley Act includes a provision which states: "Nothing in this section shall create a new, private right of action." Public Company Accounting Reform and Investor Protection Act of 2002, Pub. L. No. 107-204 § 804(c), 116 Stat. at 801. The Second Circuit in Enterprise Mortgage found this language clouded an interpretation that the Sarbanes-Oxley Act applied retroactively. 391 F.3d at 407. The NDAA lacks a similar muddying counterpart which could prevent us from finding that Congress clearly intended to give the NDAA a retroactive effect. See Landgraf, 511 U.S. at 268 (requiring that Congress "make its intention clear").

Because we disagree with appellants that the NDAA lacks a clear retroactivity command, our inquiry ends, and we need not reach their contention that the statute would have an impermissibly retroactive effect. See Lattab, 384 F.3d at 14 ("If this perscrutation leads to a firm conviction that Congress intended the statute to have a specific temporal reach, the retroactivity

analysis ends and we will apply the statute in accordance with Congress's prescription."); Ahmed, 72 F.4th at 400 (finding an explicit retroactivity command for pending actions and ending the inquiry); see also Lieberman v. Cambridge Partners, L.L.C., 432 F.3d 482, 491-92 (3d Cir. 2005) (proceeding to review whether the Sarbanes-Oxley Act had an impermissible retroactive effect after concluding it lacked a clear directive from Congress).[29]

### i. Gasarch

Before departing from our statute of limitations conversation, we must turn to Gasarch's stand-alone claim. Unlike her fellow appellants, Gasarch does not claim that the NDAA lacks retroactive effect. Rather, Gasarch seeks to benefit from the NDAA's implementation of a five-year statute of limitations for non-scienter-based securities violations.

The SEC has a shorter, five-year window to bring a disgorgement claim for securities violations that do not require scienter to be established. 15 U.S.C. § 78u(d)(8)(A)(i). That much is not up for debate. Gasarch's claim comes from the disjunctive use of the word "or" on her jury verdict form -- which to her means "there can be no confidence that the jury found Mrs. Gasarch as an aider and abettor to another's scienter-based

---

[29] Given our holding, we need not address appellants' claim that tolling is unavailable, nor the SEC's contention that due to appellants' fraudulent scheme taking place within a five-year window, the NDAA could have applied non-retroactively.

violation."  Therefore, she says the SEC cannot order disgorgement from any securities violations committed before August 5, 2016. Here's a bit more about this controversial verdict form.

The jury found that Gasarch violated Section 17(a)(3) of the Securities Act and that she aided and abetted the violation of securities laws.  The fine print under the aiding and abetting finding reads:

> Did Zhiying Yvonne Gasarch aid and abet violations of Sections 17(a)(1), Sections 17(a)(3) of the Securities Act of 1933, or Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(a) and (c) thereunder by others?[30]

While the jury's answer to this question is unambiguous ("YES"), Gasarch laments that it is possible she was only found liable for aiding and abetting violations of Section 17(a)(3) -- a non-scienter-based security violation.  See SEC v. Ficken, 546 F.3d 45, 47 (1st Cir. 2008) (stating that negligence is sufficient to establish liability under Section 17(a)(3)).  And because an individual who aids and abets a securities violation "shall be

---

[30] The critical word here, "or," was written in ink after the verdict form was printed.

The SEC also makes a one-off comment that Gasarch should have requested a special verdict form if she wanted to reap the benefits of a particular reading of the jury verdict.  Gasarch adamantly refutes this attempt to place the blame on her.  Neither party has made any attempt at developed argument on this point, and because it will be immaterial to our conclusion, we decline to weigh in on this issue.

deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided," Gasarch believes her disgorgement statute of limitations must be limited to five years. 15 U.S.C. § 78t(e).

The district court dealt with this quandary by supplementing the jury's verdict with its own factual findings. Sharp II, 737 F. Supp. 3d at 80. First, when imposing injunctive relief, the district court found that Gasarch acted intentionally, and thus with scienter. Id. On a related note, the court determined that Gasarch's argument lacked merit because scienter is required to prove aiding and abetting liability, regardless of the underlying primary violation. Id. And later, when imposing civil penalties, the court found that Gasarch worked as Sharp's assistant at the hub of the fraudulent enterprise, which meant that "she aided and abetted the Sharp scheme clients in their violation of both the Securities Act and the Exchange Act." Id. at 85. These findings arose during the court's analyses of different remedies; however, when discussing disgorgement, the court made clear it was applying the ten-year statute of limitations to all appellants because all "acted with varying degrees of scienter." Id. at 93.

Gasarch declined to address the district court's analysis or additional fact findings on which it relied when entering the judgment that she now appeals. The result of this

decision is that her claim is waived, and we will not venture off into complex, greenfield legal questions without the benefit of developed argumentation from either party. Sparkle Hill, 788 F.3d at 30 (finding waiver where "the opening brief presents no argument at all challenging express grounds upon which the district court prominently relied in entering judgment").

There's nothing more to say on this matter, other than the ten-year statute of limitations period as applied to Gasarch's disgorgement calculation remains in place.

## 5. Identifying Victims

Still operating within the realm of the district court's disgorgement awards, appellants next present arguments related to the disbursement of disgorged funds to victims. On this front, appellants' claims rhyme, but raise slightly different issues for us to address. Veldhuis, Sexton, and Kelln (thinking big picture) say the district court erred because the SEC failed to identify any victims who suffered pecuniary harm, something they consider an essential prerequisite for ordering disgorgement. On the other hand, Friesen (thinking about his case) says the district court should have made the SEC produce the identities of the victims who would receive any disgorged funds before it ordered him to pay up. We'll start with the big picture and work our way into the specifics.

Resolving this dispute requires us to return briefly to the Supreme Court's guidance in Liu along with our binding precedent established in Navellier. The disgorgement remedy lies atop two bedrock principles: it "strip[s] wrongdoers of their ill-gotten gains"; and it is "restricted . . . to an individual wrongdoer's net profits to be awarded for victims." Liu, 591 U.S. at 79 (emphasis added). A simple conclusion follows: disgorgement requires a victim.

Appellants supplement this simple conclusion by defining a victim as one "who suffered pecuniary harm" and claim that "none of the evidence marshalled demonstrates investors suffered pecuniary harm." While we have previously decided that there is no requirement for "investors to suffer pecuniary harm as a precondition to a disgorgement award," Navellier & Assocs., Inc., 108 F.4th at 41 n.14, we need not rely on that principle because, as the district court noted, appellants' scheme certainly harmed investors. See Sharp II, 737 F. Supp. 3d at 93 (referencing "plans to return the disgorged funds to the harmed investors").

For a fraudster to profit from a pump and dump scheme, they must sell their inflated shares to someone else, who ultimately gets stuck with an empty bag of goods. See United States v. Weed, 873 F.3d 68, 70 n.1 (1st Cir. 2017) (explaining the components of a pump and dump scheme); see also Hemi Grp., LLC v. City of New York, 559 U.S. 1, 28-29 (2010) (Breyer, J.,

dissenting) (listing the last step of a pump and dump scheme as "[w]hen the fraud is revealed, the price crashes, to the investors' detriment").  The evidence shows appellants paying for various stock promotions, dumping their shares into the market, and reaping substantial profits -- all of which gives rise to the inescapable inference that some cohort of unwitting investors suffered pecuniary harm as a result.

Friesen's take on this issue (as we mentioned) is slightly different, but nevertheless leads to a similar result. Friesen argues that the district court erred in awarding disgorgement before it considered the SEC's plan for allocating the disgorged funds to victims.  According to Friesen, the court could have reviewed the SEC's plan and realized that the disgorgement figures requested based on the Q system were too high. The district court called this argument "premature" and accepted the SEC's assurances that "a plan can and will be submitted to the [c]ourt, to its satisfaction, detailing plans to return the disgorged funds to the harmed investors."  Sharp II, 737 F. Supp. 3d at 93.

Following the entry of judgment against appellants, the SEC filed a motion to establish a fund and framework to distribute disgorged funds to harmed investors.  We have previously affirmed a disgorgement award where "the SEC intend[ed] to distribute to the [victims] any disgorgement awarded" without requiring the SEC

to have already identified those victims. Navellier & Assocs., Inc., 108 F.4th at 41 n.14. With the presence of a plan to disburse disgorged funds in place, awaiting those funds, we cannot conclude the district court abused its discretion in finding the request to provide a list of victims premature.

### 6. Double Counting

To continue, appellants Veldhuis, Sexton, and Kelln also claim that the district court abused its discretion in failing to protect against impermissible double counting. That is, appellants claim the SEC's disgorgement requests in this case overlap with funds that Knox (the same Knox who testified for the SEC at trial) agreed to return from his own enforcement action. The SEC calls their bluff, and recharacterizes the one snippet of trial testimony cited by appellants as discussing a different matter entirely.

The district court acknowledged appellants' concerns over double counting, Sharp II, 737 F. Supp. 3d at 89 (considering this as appellants' seventh argument before the district court), but it did not specifically address this argument beyond a catch-all conclusion that it found "the remaining objections raised by the [appellants] unavailing," id. at 93. After reviewing appellants' scant evidentiary support for this claim, we lack a firm conviction that the district court made a meaningful error in

its judgment; that means the disgorgement award must stay put. Allow us to explain why we lack that necessary conviction.

Appellants say that Knox testified to returning millions of dollars in funds that "he believed belonged to 'Sharp Group' clients." At trial, Knox testified that he agreed to return $7 million that "belong[ed] to clients of Silverton" which was his firm. He also stated that those millions of dollars had something to do with Sharp's clients, an individual named Luis Carrillo, and Fred Sharp himself, but could not say exactly how much belonged to who. That is the extent of evidentiary support appellants cite and meager fare for claiming the district court abused its discretion. Cf. SEC v. First City Fin. Corp., 890 F.2d 1215, 1232 (D.C. Cir. 1989) (rejecting appellants' efforts to rebut the SEC's reasonable disgorgement approximation with "impossibly speculative" claims).

So, while appellants allege double counting occurred, they have not shown how (if at all) the funds that Knox returned overlap with any of the proceeds allocated to their individual Q accounts which they've been ordered to repay. As such, appellants failed to rebut the SEC's reasonable approximation. See Navellier & Assocs., Inc., 108 F.4th at 42.

### 7. Knox Restitution Fund

In our final conversation on disgorgement (before addressing two other remedies), Kelln claims the district court's

indicative approval of the SEC's proposed distribution plan for her disgorged funds was "reversible error."[31] The SEC's plan proposed contributing money collected from Kelln (and Gasarch) to the "Knox Restitution Fund."[32] That fund arose from the SEC's plan to pay back victim-investors with profits disgorged from Knox after he pleaded guilty in a separate proceeding. The SEC calls this claim premature because (1) Kelln's money hasn't been collected yet; and (2) Kelln's contribution to the Knox Restitution Fund is only a possibility at this stage.

This argument pulls on a few different threads. It is undisputed that a disgorgement award is an unlawfully retained sum, "rather than a requirement to replevy a specific asset." Navellier & Assocs., Inc., 108 F.4th at 43 (quoting SEC v. Banner Fund Int'l, 211 F.3d 602, 617 (D.C. Cir. 2000)). And, as we addressed earlier, the district court acted within its discretion by ordering disgorgement prior to reviewing and approving the SEC's

_____

[31] On September 18, 2024, while this appeal was pending, the district court issued an "indicative ruling" that it "intends to allow the Fair Plan motion in its entirely [sic], save only that, if the funds presently ordered disgorged exceed the sum of the identified claimants claims, such funds shall be retained by the SEC subject to further order of the [c]ourt."

[32] The SEC's plan for distributing funds to the Knox Restitution Fund includes proceeds disgorged from Gasarch. Gasarch does not challenge this plan on appeal, and her blanket intention to adopt and incorporate all other arguments made by her co-appellants lacks any independent argumentation on this point whatsoever. Accordingly, she has waived this issue. See United States v. Maldonado-Peña, 4 F.4th 1, 41 n.29 (1st Cir. 2021).

plan to distribute the funds to victims. See SEC v. Blackburn, 15 F.4th 676, 682 (5th Cir. 2021). But also, disgorgement must be limited to a wrongdoer's "'net profits' and must 'be awarded to victims.'" Id. (quoting Liu, 591 U.S. at 75). The question then becomes whether disgorged funds wrongly procured must be awarded to victims of the same wrongful conduct. As Kelln succinctly notes, her victims are not necessarily Knox's victims. And while the SEC claimed in its proposal that Kelln's misconduct (via her role with the Sharp Group) related to sixteen out of seventeen securities manipulated and selected in the case against Knox, only one (Vitality Biopharma Inc.) is mentioned in the complaint against Kelln.

This kind of cross-pollination seems at odds with the "equitable nature of the profits remedy [that] generally requires the SEC to return a defendant's gains to wronged investors for their benefit." Navellier & Assocs., Inc., 108 F.4th at 42 (quoting Liu, 591 U.S. at 88). That said, we still think, given the posture of this challenge, our input is premature and Kelln is wrong to call the district court's indicative ruling reversible error. In accordance with Federal Rule of Civil Procedure 62.1(a)(3), the district court acknowledged the pendency of this appeal in its order and provisionally stated that it intended to grant the SEC's motion. See United States v. Maldonado-Rios, 790 F.3d 62, 64-65 (1st Cir. 2015) (citing Fed. R. App. P. 12.1). The

district court remains duty bound to review and approve the SEC's plan for distribution in the normal course, and the SEC retains its discretion in allocating Kelln's disgorged assets, which may ultimately end up catering to the concerns she raises here. See In re Drexel Burnham Lambert Grp. Inc., 995 F.2d 1138, 1146 (2d Cir. 1993) (declining to consider the issue of mixed distribution funds prior to a court order approving the SEC's distribution plan).

*

To conclude, after considering all appellants' disgorgement related claims, the disgorgement awards as imposed by the district court remain in place.

## B. Civil Penalties

To briefly reorient the reader, the SEC requested two additional remedies from the district court on top of disgorgement. Those additional requested remedies (which the district court granted) were the imposition of civil penalties and injunctions barring conduct related to securities trading. Appellants Gasarch and Sexton appeal the district court's decision to impose civil penalties, and that is where we turn our attention to next.[33]  We

---

[33] Friesen has not appealed the district court's injunctions or civil penalty of $1,562,603 against him. Sharp II, 737 F. Supp. 3d at 77-84. Accordingly, his appeal has concluded, and any reference to "appellants" from here on will not include Friesen.

Likewise, all argument pertaining to civil penalties in

will first set out the relevant legal landscape controlling the contours of our discussion before addressing the individualized concerns of Gasarch and Sexton -- specifically the evidence brought against them that gave rise to their respective civil penalties.

Our federal securities laws authorize the SEC to seek, and district courts to impose, civil penalties from any person who has violated securities laws. 15 U.S.C. § 77t(d)(1). District courts pull the amount in civil penalties from a hierarchical three-tiered schedule in light of the facts and circumstances surrounding the violation. Id. § 77t(d)(2). First-tier penalties apply generally, id. § 77t(d)(2)(A), second-tier penalties apply to violations that "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," id. § 77t(d)(2)(B), and third-tier penalties apply to violations involving the second-tier requirements plus "substantial losses or . . . a significant risk of substantial losses to other persons," id. § 77t(d)(2)(C). The applicable tier sets the maximum penalty, but the actual penal amount falls under the discretion of the district court. SEC v. Kern, 425 F.3d 143, 153 (2d Cir. 2005)

---

Veldhuis, Sexton, and Kelln's collective brief solely references Sexton and the SEC's evidence against him. Per our Circuit's rule, we respond only to Sexton's claims and deem any similar arguments from Veldhuis or Kelln waived. See Maldonado-Peña, 4 F.4th at 41 n.29.

(citing 15 U.S.C. § 77t(d)).  We have previously identified several factors a district court may take into account when evaluating whether to assess civil penalties: "(1) the egregiousness of the violations; (2) the isolated or repeated nature of the violations; (3) the defendant's financial worth; (4) whether the defendant concealed his trading; (5) what other penalties arise as the result of the defendant's conduct; and (6) whether the defendant is employed in the securities industry."  SEC v. Sargent, 329 F.3d 34, 42 (1st Cir. 2003).  We review the penalties assessed for abuse of discretion.  See id.

The SEC's requests for civil penalties are subject to a five-year statute of limitations.  Gabelli v. SEC, 568 U.S. 442, 445 (2013) (citing 28 U.S.C. § 2462).  According to this undisputed five-year window, the district court established August 5, 2016, to August 5, 2021, as the relevant period for reviewing securities law violations that could give rise to civil penalties.  Sharp II, 737 F. Supp. 3d at 81.  Gasarch and Sexton both claim the SEC failed to produce sufficient evidence of violations occurring within that timeframe to support the district court's determination.

### 1. Gasarch

After considering the SEC's request and weighing the relevant factors, the district court imposed a civil penalty of $296,651 against Gasarch.  Id. at 86.  In reaching that figure,

the court agreed with the SEC that Gasarch's aiding and abetting violations of the Securities Act and the Exchange Act warranted two third-tier penalties, and her primary violation of Section 17(a)(3) of the Securities Act warranted an additional second-tier penalty. Id. at 86 nn.11-12. However, the court granted a downward variance from the amount initially requested by the SEC, in part due to Gasarch's aider and abettor status. Id. at 86. Now, Gasarch summarily claims that "[w]ithout proof of a violation post-dating August 5, 2016, the SEC's request for penalties should have been denied."

Turning to the record once again, Gasarch's claim fails to hold water. The SEC's evidence showed Gasarch altering information on wire requests in May 2017 and setting up a fictious loan agreement for a Sharp Group nominee company in May 2018. Furthermore, the district court found that Gasarch operated alongside Sharp at the hub of the Sharp Group's fraudulent scheme, Sharp II, 737 F. Supp. 3d at 85, and Q system data revealed that the scheme continued to operate after August 5, 2016, a fact that Gasarch has not meaningfully contested.

Based on the evidence of Gasarch's conduct that occurred within the statute of limitations, the court did not abuse its discretion in assessing its downwardly varying penalty against her.

## 2. Sexton

As for Sexton, the district court calculated a $1,562,603 civil penalty against him for seven separate third-tier violations that occurred during the appropriate five-year window. Id. at 84. The seven violations correspond to Sexton's trading in seven out of the fourteen problematic stocks relevant to the Sharp Group's scheme between August 2016 and August 2021 -- the idea being that Sexton could not have traded those securities without having disguised his ownership through the Sharp Group's services and that substantial losses to other persons occurred because of the pump and dump schemes. Id. at 82 (finding seven to be "the number of entities [Sexton] utilized to defraud unwitting investors during the five years preceding August 2021"). On appeal, Sexton claims the court erred because any trades were not connected to violations of securities laws and the SEC's limited evidence shows that he profited from only three of the problematic stocks during the relevant time frame, rather than seven.

As before with Sexton's disgorgement award, the terms of Sexton's consent judgment foreclose his claim that he did not violate the securities laws as alleged by the SEC. Cf. Hallam, 42 F.4th at 326 (finding the terms of a consent judgment foreclosed appellant's challenge to the SEC's ability to seek a disgorgement award). Furthermore, to the extent Sexton's consent judgment authorized the court to "resolve any material factual disputes" at

the remedies phase, the court did not abuse its discretion in relying on the declaration submitted by the SEC's expert witness Ryan Murphy. See Sharp II, 737 F. Supp. 3d at 83 (discussing Murphy's declaration). Murphy provided competent testimony at Gasarch and Friesen's trial and spent "several hundred hours" preparing the Q system summaries referenced in his declaration. And Murphy's declaration (based on the Q system and other available evidence) concludes that "Veldhuis, Sexton, and Friesen, working together . . . traded the securities of seven of the Fourteen Issuers" between August 2016 and August 2021. As was the district court's prerogative, it settled the relevant facts based on the evidence presented and it did not err in assessing seven third-tier penalties on Sexton.[34]

Based on the above, we affirm the civil penalties imposed against Sexton and Gasarch and continue on.

## C. Injunctive Relief

The final scene of this collective appeal involves only Sexton and his challenge to four permanent injunctions imposed against him by the district court. "In an SEC enforcement action,

---

[34] We acknowledge Sexton's claim that the Q data shows he received profits from trades in only three of the seven problematic stocks during the relevant period -- and profits can be evidence of trading. The district court, too, recognized as much when entering its judgment and appropriately levied penalties based on Sexton's misconduct as opposed to his receipt of profits. Sharp II, 737 F. Supp. 3d at 83.

we review the district court's decision to enter an injunction for abuse of discretion." SEC v. Lemelson, 57 F.4th 17, 30 (1st Cir. 2023).

Pursuant to federal law, the SEC may seek injunctive relief to prevent the violation of securities laws. 15 U.S.C. § 78u(d)(1); see also Lemelson, 57 F.4th at 30. A district court may grant injunctive relief "where there is, at a minimum, proof that a person is engaged in or is about to engage in a substantive violation of either the Securities Act of 1933 or the Securities Exchange Act of 1934 or of the regulations promulgated thereunder." Lemelson, 57 F.4th at 30 (citation modified). Typically, when considering whether a district court abused its discretion in entering an injunction, we view the decision in light of several non-determinative factors such as the nature of the violation, the individual's capacity to commit future violations, and whether the individual has recognized the wrongfulness of their conduct. See id.

Sexton's appeal, however, does not challenge the district court's consideration of those factors. Instead, Sexton claims the district court issued impermissible "obey-the-law" injunctions that enhance the penalties he could face for potential violations down the road and deprive him of adequate notice of the barred conduct as required by Federal Rule of Civil Procedure

65(d).[35]  The SEC states that injunctions like the ones entered by the district court are run of the mill in enforcement actions with sufficient guardrails in place to alleviate Sexton's concerns.

"[T]he district court has 'broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past.'" Brown v. Trs. of Bos. Univ., 891 F.2d 337, 361 n.23 (1st Cir. 1989) (quoting NLRB v. Express Publ'g Co., 312 U.S. 426, 435 (1941)).  Yet every order granting an injunction must "state its terms specifically" and "describe in reasonable detail -- and not by referring to the complaint or other document -- the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1); see SEC v. Keener, 102 F.4th 1328, 1336 (11th Cir. 2024).  In exercising its discretion, a district court may enter a broad injunction, largely adopting language from a statute or regulation, so long as the enjoined individual knows exactly what she's been ordered to do or not to do.  See Keener, 102 F.4th at 1336; cf. Brown, 891 F.2d at 361 n.23 (affirming an injunction as not overbroad for prohibiting various forms of sex

_____

[35] Courts in our circuit have adopted the term "obey-the-law" injunctions in similar contexts.  See SEC v. McLellan, 737 F. Supp. 3d 95, 106 (D. Mass. 2024); SEC v. Sargent, 790 F. Supp. 3d 37, 40 (D. Mass. 2025); see also League of Women Voters of N.H., et al. v. Kramer, et al., No. 24-cv-73-SM-TSM, 2025 WL 3260024, at *5 (D.N.H. Oct. 17, 2025).

discrimination).  Lastly, obey-the-law injunctions may be "necessary to prevent further violations where a proclivity for unlawful conduct has been shown."  McComb v. Jack. Paper Co., 336 U.S. 187, 192 (1949); see also SEC v. Sargent, 790 F. Supp. 3d 37, 40 (D. Mass. 2025).

In its judgment against Sexton, the district court "permanently restrained and enjoined" him from violating: (1) Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; (2) Section 17(a) of the Securities Act; (3) Section 5 of the Securities Act; and (4) Section 13(d) of the Exchange Act and Rule 13d-1 promulgated thereunder.[36]  We have previously affirmed broad obey-the-law injunctions related to securities laws, see Lemelson, 57 F.4th at 30, 32 (affirming an injunction prohibiting violations of Section 10(b) and Rule 10b-5 for five years), without expressing our view on whether such an injunction properly places an individual on notice of what they are barred from doing.

As a general matter, we disagree with Sexton's premise that obey-the-law injunctions are per se impermissible.  See McComb, 336 U.S. at 191-92; Brown, 891 F.2d at 361 n.23.  Nor do

---

[36] The court also enjoined Sexton from participating in any offering of a penny stock and from participating in any securities transactions beyond purchasing and selling securities for his own personal accounts.  He has not appealed for relief from those injunctions.

we believe the district court abused its discretion in issuing these permanent injunctions against Sexton (save one which we will address at the end).  As with any injunction sought by the SEC in an enforcement action, "the legal standard for issuance . . . is a reasonable likelihood of recidivism."  SEC v. Sargent, 129 F.4th 1, 15 (1st Cir. 2025) (citation modified).  Thus where (as here) the district court finds a particularly high proclivity for unlawful conduct of a sophisticated nature, a sweeping obey-the-law injunction can be appropriate recourse due to the broad scope of potential future violations.  See McComb, 336 U.S. at 191-92; see also Keener, 102 F.4th at 1336.  Sexton engaged in a decade-long, international securities fraud scheme involving at least fourteen separate stock issuers, dozens of players, and clandestine operations fitting of a James Bond spin-off.  See Sharp II, 737 F. Supp. 3d at 75-76.  The district court did not abuse its discretion in issuing injunctions that map onto the language of federal securities laws because Sexton has demonstrated a willingness and capacity to engage in conduct stretching the contours of those laws.  See SEC v. McLellan, 737 F. Supp. 3d 95, 110 (D. Mass. 2024).

Furthermore, while the language of the injunctions issued against Sexton may be broad, "they are not complicated." Id.  The injunctions state that Sexton may not engage in fraud in the offering or sale of securities and cannot engage in the sale

of securities without adhering to the relevant registration requirements. Directions to comply with these foundational concepts provide reasonable detail to Sexton and therefore do not contravene the requirements of Federal Rule of Civil Procedure 65(d).

One injunction, however, does impermissibly run afoul of Rule 65(d)(1)(C)'s requirement that an injunction may not incorporate a separate document by reference. The fourth permanent injunction -- which permanently restrains and enjoins Sexton from violating Section 13(d) of the Exchange Act and Rule 13d-1 promulgated thereunder -- references "information required by Schedule 13D" and "any equity security of a class which is specified in Exchange Act Rule 13d-1(I)." The other three permanent injunctions first cite the relevant securities law before listing specific conduct thereby prohibited (such as engaging in fraud). By contrast, the fourth permanent injunction only cross-references the Code of Federal Regulations without any guidance for Sexton as to what his court-ordered obligations are. See SEC v. Goble, 682 F.3d 934, 952 (11th Cir. 2012) ("Plainly, Goble would need to look beyond the four corners of the district court's injunction in order to comply with its strictures."). This is a bridge too far, and, accordingly, we vacate this portion of the injunction and remand for the district court to describe the

requirements and proscribed conduct within its injunction.  <u>See</u>
<u>id.</u>

## V. CURTAIN CALL

For the foregoing reasons, the verdicts entered against Gasarch and Friesen, the district court's disgorgement awards against all appellants, and the civil penalties imposed against all appellants are **<u>affirmed</u>**.  Likewise, we **<u>affirm</u>** the permanent injunctions issued against Sexton barring violations of (1) Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; (2) Section 17(a) of the Securities Act; and (3) Section 5 of the Securities Act, but **<u>vacate</u>** the permanent injunction barring violations of Section 13(d) of the Exchange Act and Rule 13d-1 promulgated thereunder, and **<u>remand</u>** for proceedings consistent with this opinion.

No costs are awarded.